169 Ill. App.3d 459 (1988)
523 N.E.2d 912
CHICAGO BOARD OF EDUCATION, Appellant,
v.
THE INDUSTRIAL COMMISSION et al. (Vincent J. Moore, Sr., Appellee).
No. 1-86-2272WC.
Illinois Appellate Court  First District (Industrial Commission Division).
Opinion filed March 9, 1988.
Rehearing denied June 3, 1988.
*460 Patricia J. Whitten, of Board of Education Law Department, of Chicago, (Michael Cohen, of counsel) for appellant.
Robert J. Pavich and Barry A. Spevack, both of Monico & Pavich, of Chicago, for appellee.
Judgment reversed.
JUSTICE McCULLOUGH delivered the opinion of the court:
Claimant, an elementary school teacher, filed two applications for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 et seq.) for separate incidents occurring on January 5, 1976, and January 5, 1978. During the course of the compensation proceedings claimant was allowed to amend his applications to seek compensation under the Occupational Diseases Act (Ill. Rev. Stat. 1985, ch. 48, par. 172.36 et seq.). The arbitrator awarded claimant $251.09 for 210 6/7 weeks of disability under section 19(b) of the Occupational Diseases Act (Ill. Rev. Stat. 1985, ch. 48, par. 172.54(b)). Claimant was also awarded medical benefits and respondent was ordered to provide rehabilitation services. On review, the Industrial Commission (Commission) affirmed the arbitrator, but vacated the rehabilitation award and remanded to the arbitrator for proceedings on the issue of permanent disability. On certiorari, the circuit court confirmed the Commission order. Respondent filed a timely notice of appeal. On appeal, the issue is whether claimant established he was exposed to or suffered from a compensable occupational disease.
Claimant, a 56-year-old school teacher, was employed by respondent from June 1967 to June 1978 and was assigned exclusively to the Hefferen Elementary School, where he taught a variety of subjects. In September 1978, instead of returning to his teaching duties after the summer recess, claimant sought treatment at the Portage-Cragin Mental Health Center, where he was counseled on a weekly basis by Deborah Gessner, a psychiatric social worker. Claimant took a 25-month leave of absence from the Chicago Board of Education (Board) and except for tutoring a blind student and selling hot dogs for a short time was not gainfully employed during that period. He applied for reinstatement to his teaching position in January 1981 but was rejected because he failed a psychiatric evaluation conducted by respondent's *461 psychiatrist.
At the hearing before the arbitrator, Deborah Gessner testified she counseled claimant for a "great psychological debilitation" which she stated was caused by the gradual deterioration of claimant's work environment, chaos in the classroom, lack of support from the administration, physical assault by students, inability to comply with school regulations, unmanageable students, inability to control the classroom, and physical isolation in a mobile classroom detached from the main school facility. Gessner testified claimant's condition was a reactive depression characterized by feelings of hopelessness, failure and inadequacy emanating from claimant's work environment.
On cross-examination, Gessner discounted claimant's childhood experiences and the fact he had been hospitalized for psychiatric care while in the Army in 1944 as factors in claimant's present condition of ill-being. Gessner also believed claimant had a stable marital and family relationship with his wife and children which was not a source of claimant's depression.
Claimant testified before the arbitrator he graduated from high school in 1940 and worked until he was drafted into the Army in 1943. He was discharged from his noncombat position 18 months later after hospitalization for a psychiatric disorder. He subsequently attended several universities and worked principally as an insurance salesman, first for New York Life Insurance Company from 1953 to 1960, and from 1960 to 1967 as a self-employed insurance broker. He worked for respondent as a substitute teacher during the 1960's and became a full-time substitute in 1967.
Petitioner testified extensively concerning incidents of stress, assaults, and injuries he received in the course of his teaching duties. On March 4, 1974, while unloading teaching materials from his car, which he was forced to remove from a mobile classroom each evening because of vandalism, claimant was struck on his right shoulder by a piece of concrete.
On March 18, 1974, while performing the same task, he was robbed at knife point by three men. While cooperating with police in the investigation of this crime, he received an anonymous phone call directing him to drop the investigation.
On April 3, 1974, a female student engaged in a fight with another student, kicked and scratched him when he attempted to intervene.
On May 9, 1974, he was kicked and bitten by a student who was engaged in a fistfight.
On the last day of school in 1973 claimant was chased from the *462 school yard by 12 to 15 students and was struck in the back with a rock.
In the fall of 1973, claimant slightly injured his leg when he stumbled out of the doorway of the mobile classroom when the steps leading to the unit had been moved away from the building.
On January 5, 1976, while in the main school building, after school hours, claimant saw a boy lying on the floor and went to his aid. Claimant testified the child was faking injury and pushed claimant, causing him to fall and injure his back.
On January 5, 1978, a violent fight broke out between two boys in the classroom. While intervening, one child grabbed claimant's arm and struck it on a table. His right elbow was injured requiring medical attention, including a brace and sling. Claimant is still treated for the injury to his elbow and his back, which he reinjured on October 25, 1977, while moving books at the direction of the principal.
Claimant also testified to a variety of working conditions which exacerbated his problems. In 1976 the school board made a change in the duties of teachers requiring more paperwork. Claimant maintained he spent two to four hours each night keeping up with the additional reports he was required to prepare. He had continuous difficulty keeping discipline in the classroom because of the nature of the students being taught, and although unruly children were sent to the principal's office, they were often returned to the classroom without being disciplined or counseled. Claimant maintained this was a violation of the union contract.
Claimant was also a member of the teacher professional and problem committee, a group of faculty members who submitted problems to the principal. Claimant testified the principal did not resolve faculty complaints about increased paperwork and discipline.
Claimant also maintained the principal was abusive to him, citing a September 1976 incident when the principal yelled at him and cursed him for being late and leaving his class unattended for several minutes while the class went to recess. This incident occurred on the playground in full view of the entire school and claimant stated he felt humiliated.
In May 1978, claimant testified a female student was brought to his classroom and placed there for the remainder of the school year. The student had just broken the leg of another teacher by striking her with a chair. Although claimant objected to the inclusion of the student in his class, he was told there was nothing he could do about it. The child was violent and refused to do any work for the remainder of the school year.
*463 Claimant testified he could not return to teaching in the fall of 1978 because he could not face the assignment citing, in particular, the incident in which his arm was injured, which affected his ability to do his job because he was right-handed. He also found stressful the 1978 incident in which the female student was assigned to his class.
On cross-examination, claimant stated he grew up in a poor family and was raised by his mother after his father disappeared. He admitted being discharged from the Army because of psychiatric problems manifesting themselves in outbursts of crying and tremors. He acknowledged he was disappointed when he was denied a master's degree after failing the oral examination. He also stated he quit his job selling life insurance because he did not make enough money and did not like the pressure of selling because he had difficulty meeting new people and persuading them to buy insurance.
He nevertheless started his own insurance company in 1960, with hs wife helping with clerical work. He stated there was a difference in the pressure of selling insurance when he worked for himself. He closed that business, however, because the business climate in the mid-1960's required that he be more aggressive and he did not believe insuring people's property furthered the goal he had set for himself of helping people.
Claimant also stated the increased work load at school caused him to stay late every evening. He denied ever conducting insurance-related business during these late night sessions, although he admitted his insurance business consumed approximately 20% of his time for several years after he stopped actively soliciting new accounts. He also denied being constantly late for class although he occasionally got up late or bad weather prevented him from being at school on time.
Claimant admitted he did not have many friends and separated from his family in April 1979 because he was continually fighting with his wife and children. He denied any physical altercations occurred, however. He stated he moved out of the house to find a calmer atmosphere at the suggestion of one of his psychologists. He became upset when his teenage daughter brought friends to the house and caused a commotion. He was also disturbed by his adult son who lived at home and made noise playing the stereo. He denied telling a psychiatrist he and his wife engaged in physical fights. He also admitted that from 1970 through 1977 he received excellent ratings on his teacher evaluations, the second highest rating a teacher could achieve.
Ronald Gehrig, a vocational rehabilitation counselor, testified he interviewed claimant, had gone over his history, had spoken to claimant's social worker, and researched the job structure of the Board of *464 Education. In Gehrig's opinion, claimant was a candidate for vocational rehabilitation and could become a teacher's aid as long as claimant did not have to assume primary responsibility for a classroom. In the absence of a teaching job, Gehrig thought claimant could perform retail sales as long as the tempo was low-key. Gehrig did not believe claimant could succeed at selling insurance because it was a high-pressure job.
Keith Van Wieren, a guidance counselor at the school where claimant taught, testified for respondent. Van Wieren had known claimant since 1966 and had no particular prior problems with him. It was Van Wieren's opinion the principal at the school was an individual who did not "make waves," keeping problems in-house. Van Wieren thought the principal was not arbitrary or disrespectful to teachers and did not play favorites among the faculty.
Van Wieren stated the Hefferen school was no different than any other inner-city school. It was not chaotic and Van Wieren was not in fear of his life. The student body by and large was manageable although individuals could become very disruptive. To Van Wieren's knowledge, no teachers other than claimant ever stayed after school to work on school business. Van Wieren stated claimant went "by the book" on discipline and had tried, without success, to establish a more rigorous disciplinary code. Van Wieren stated all teachers were frustrated when children were referred to the principal for discipline only to be returned to the classroom. In this respect, Van Wieren did not believe the union contract adequately spelled out the procedure for disciplining students.
Van Wieren maintained claimant once told him the paperwork for his school-related duties was overwhelming. Van Wieren once saw claimant working after hours on materials which did not appear to be school related. Van Wieren also had to substitute for claimant when he arrived late or missed work entirely.
Frances Sullivan, a first-grade teacher, testified she did not remember the principal being disrespectful to any teacher, although she agreed the principal did not back up the faculty as much as they would have liked. She attributed this to the fact the principal did not interpret the union contract in the same way as the teachers. One such area of dispute was student discipline and Sullivan was concerned the policy was too lax. Sullivan never stayed late at school because of the fear for her safety. She believed it was unwise to either come to school early or stay late. Sullivan concluded claimant had a history of precise and copious record keeping and concern with discipline which was, in Sullivan's words, "fantastic."
*465 The deposition of Myrtle Mason, a board-certified psychiatrist with the respondent, was admitted into evidence. Mason examined claimant in February of 1981 and denied his application for reinstatement on the basis two of claimant's psychiatrists disagreed about his ability to return to teaching duties given his mental condition. Mason felt claimant was less than candid about his progress and rehabilitation and was too eager to return to the classroom. There was also some indication and admission by claimant of prior physical altercations with his wife. During the course of the deposition, Mason was confronted with the fact that one of the reports upon which she relied in reaching her diagnosis was one year old at the time she examined claimant. She had thought both reports were issued contemporaneous to her examination. Claimant's treating physician, two weeks before Mason's examination, had found claimant was fit to return to full-time duties. This mistake on the part of Mason might have changed her mind about claimant's condition had she realized it at the time.
As we have indicated, the arbitrator and Commission awarded benefits under the Occupational Diseases Act.
On appeal, the issue is whether claimant established he was exposed to the hazards of or sustained an injury from an occupational disease. Section 1(d) of the Occupational Diseases Act (Ill. Rev. Stat. 1985, ch. 48, par. 172.36(d)) states in pertinent part:
"In this Act the term `Occupational Disease' means a disease arising out of and in the course of the employment or which has become aggravated and rendered disabling as a result of the exposure of the employment. Such aggravation shall arise out of a risk peculiar to or increased by the employment and not common to the general public.
A disease shall be deemed to arise out of the employment if there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is performed and the occupational disease. The disease need not to have been foreseen or expected but after its contraction it must appear to have had its origin or aggravation in a risk connected with the employment and to have flowed from that source as a rational consequence."
On appeal, respondent argues claimant has not established he suffers from an occupational disease within the meaning of the Act and, alternatively, the Commission's decision to award compensation is against the manifest weight of the evidence. Relying upon Pathfinder Co. v. Industrial Comm'n (1976), 62 Ill.2d 556, 343 N.E.2d 913, and Peoria County Belwood Nursing Home v. Industrial Comm'n (1987), *466 115 Ill.2d 524, 505 N.E.2d 1026, claimant maintains compensation is available under the Occupational Diseases Act for mental disorders suffered in the absence of physical trauma or injury which develop gradually over a period of time without the necessity of finding that the injury occurred as a result of specific incidents traceable to a definite time, place, and cause.
 1 The first issue we must resolve is whether on-the-job mental stress which results in emotional illness in the absence of physical trauma and sudden disablement traceable to a definite time, place, or cause is compensable under the Occupational Diseases Act. The language employed in the opening paragraph of section 1(d) of our Occupational Diseases Act (Ill. Rev. Stat. 1985, ch. 48, par. 172.36(d)) speaks of diseases a worker is exposed to on the job causing disability as a result of that exposure. On-the-job stress, of itself, is not a disease. (McGarrah v. State Accident Insurance Fund Corp. (1983), 296 Or. 145, 675 P.2d 159.) Events and conditions capable of producing stress exist in every employment environment. Stress occasioned in reaction to employment demands may, in turn, cause mental disorders. Whether mental illness qualifies as an occupational disease depends upon whether the employee can establish the risk to which he was exposed arose out of and in the course of his employment and has a clear causal relationship to the disability suffered. Under our diseases act the disease must flow from that risk as a rational consequence.
The causal connection between claimant's mental disability and the gradual mental stimuli which allegedly produced the disease is not readily apparent. Whereas the rational mind can perceive a clear connection between exposure to asbestos and the subsequent contraction of asbestosis, for instance, there is a much more tenuous link in a situation where a person suffers a gradually developing mental disability which, in retrospect, is attributed to factors such as worry, anxiety, tension, pressure, and overwork without proof of a specific time, place, and event producing the disability.
To recognize that our occupational disease law would allow compensation for any mental diseases and disorders caused by on-the-job stressful events or conditions would, in the words of one court, open a floodgate for workers who succumb to the everyday pressures of life. (McGarrah, 296 Or. 145, 675 P.2d 159.) We reject claimant's argument the supreme court opinion in Pathfinder supports such a result. There, the supreme court, mindful of the potential for abuse in cases of alleged psychological injury through fabrication, allowed recovery on the basis the nonphysical traumatic events triggering the mental *467 disability were uncommonly gruesome and the disability immediate and sudden. Pathfinder does not authorize compensation under the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 et seq.) for anxiety, emotional stress or depression which develop over time in the normal course of an employment relationship. General Motors Parts Division v. Industrial Comm'n (1988), 168 Ill. App.3d 678.
Also Peoria Belwood does not support claimant's argument. There, an accidental injury claim under the Workers' Compensation Act for carpal tunnel syndrome was found compensable in the absence of a showing of complete disfunction due to a precisely identifiable event. As the supreme court stated, in such a case the employee must still meet the same standard of proof as other claimants alleging an accidental injury. There must be a showing that the injury is work related and not the result of a normal degenerative aging process. (Peoria Belwood, 115 Ill.2d at 530, 505 N.E.2d at 1028.) The precise holding in Peoria Belwood was that the date of an accidental injury in a repetitive-trauma compensation case is the date on which the injury "manifests itself," which means the date on which both the fact of injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person. In Peoria Belwood claimant sought treatment for her condition the day after she began experiencing physical symptoms consistent with carpal tunnel syndrome. In our view, Peoria Belwood only obviates the need for proof of a specific time, place, or event which triggers the disability if it is immediately apparent from the onset of symptoms that the disability is work related despite the fact there is no single event prior to the appearance of symptoms which is sufficient, of itself, to cause the disability. We therefore reject the contention that mental disorders are compensable as occupational diseases when the disorder allegedly was caused by general, work-related emotional pressures common to the employment relationship.
 2 The issue then is under what circumstances our occupational disease statute provides compensation for mental disorders emanating from on-the-job stressful conditions. Section 1(d) of our Act requires that the disease must appear to have had its origin in a "risk connected with the employment and to have flowed from that source as a rational consequence." (Ill. Rev. Stat. 1985, ch. 48, par. 172.36(d).) Many courts have considered this issue with varying results. (See generally 1B A. Larson, Workmen's Compensation Law § 42.23(b) (1987).) We conclude, upon examination of the several lines of precedent, that if nontraumatically induced mental disorders due to a gradual deterioration *468 of mental processes are compensable under our Occupational Diseases Act, a causal connection between the employment and the disability must be established by showing that the employment exposed the employee to an identifiable condition of the employment that is not common and necessary to all or to a great many occupations. (In re Kelly's Case (1984), 17 Mass. App. 727, 462 N.E.2d 348, aff'd (1985), 394 Mass. 684, 477 N.E.2d 582.) Stated differently, mental disorders not resulting from trauma must arise from a situation of greater dimensions than the day-to-day emotional strain and tension which all employees must experience. (School District No. 1 v. Department of Industry, Labor & Human Relations (1974), 62 Wis.2d 370, 215 N.E.2d 373; Swiss Colony, Inc. v. Department of Industry, Labor & Human Relations (1976), 72 Wis.2d 46, 240 N.W.2d 128.) As the Supreme Judicial Court of Maine reasoned in Townsend v. Maine Bureau of Public Safety (Me. 1979), 404 A.2d 1014: "[A] higher threshold level than simply the usual and ordinary pressures that exist in any working situation would erect an appropriate buffer between the employer and a host of malingering claims." (404 A.2d at 1019.) Making this a requirement in an occupational disease claim is consistent with the ruling in Pathfinder, a compensation case which predicated recovery upon substantial evidence of a sudden, severe emotional shock precipitated by an uncommonly frightening event well beyond that to which the employee would otherwise be exposed in the normal employment environment.
It follows that if the conditions producing disability must be extraordinary, they must also, from an objective standpoint, exist in reality. (See Royal State National Insurance Co. v. Labor & Industrial Relations Appeal Board (1971), 53 Haw. 32, 487 P.2d 278.) The employee must establish that the stressful conditions actually exist on the job. It is not sufficient that the employee believe, although mistakenly, the conditions exist. Under our statute there must be an actual risk connected with the employment which produces the injury. An honest perception which does not factually exist is insufficient to demonstrate a causal connection between the occupation and the disease. (See McGarrah v. State Accident Insurance Fund Corp. (1983), 296 Or. 145, 675 P.2d 159.) We also agree with the Oregon Supreme Court in McGarrah that the worker must prove that employment conditions, when compared with nonemployment conditions, were the "major contributory cause" of the mental disorder. Such a requirement comports with the statutory provision of the Occupational Diseases Act that the disability must flow from a risk as a rational consequence.
 3 Applying this test to the facts of this case, we conclude claimant *469 has not established he suffers an occupational disease within the meaning of the Act. The conditions allegedly producing the injury are no greater than those any teacher might face in an educational setting. Unruly students, an unresponsive administration, and the burdens of paperwork and record keeping are not unusual. Although claimant expressed fear for his safety, we find it significant that none of the events he described occurring over an extended period of years produced any demonstrable symptoms of mental disturbance coextensive with the events allegedly precipitating the fear. In fact, claimant's breakdown did not occur while in the course of employment with the Board. Rather, the first evidence of mental disability surfaced at the conclusion of summer vacation prior to the start of a new school year.
We also discount the testimony of the psychiatric social worker that claimant's problem emanated solely from his work environment. Her opinion was rendered without benefit of all the facts and was based, in part, on faulty information. The social worker, for instance, minimized claimant's relationship with his family, believing it was harmonious, when in fact claimant was having severe marital difficulties. The social worker also based her opinion, in part, on claimant's perception that the principal was demeaning to claimant when there is no objective evidence, other than claimant's perception, to support this claim and testimony was presented directly refuting it by other faculty members. Under these circumstances, we do not believe claimant established that the events giving rise to the disability were out of the ordinary in relation to the normal workplace environment or that some objectively existed in reality or that they were the predominating cause of his illness. Accordingly, we do not believe claimant has proved his depressive disorder arose out of and in the course of his employment or was the consequence of an accidental injury.
For the foregoing reasons, the judgment of the circuit court and the decision of the Industrial Commission are reversed.
Reversed.
BARRY, P.J., and McNAMARA, WOODWARD, and CALVO, JJ., concur.