THE CITY OF SPRINGFIELD, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Ronald Mose, Appellee).

Fourth District (Industrial Commission Division)   No. 4—90—0483WC

Opinion filed May 7, 1991.—Rehearing denied July 10, 1991.

James K. Zerkle and Peggy J. Witt, both of Office of Corporation Counsel, of Springfield, for appellant.

Gregory A. Scott, of Scott & Scott, P.C., of Springfield, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Claimant suffers from a stress-related mental disease. The arbitrator and Industrial Commission (Commission) awarded temporary total disability benefits. The City of Springfield appeals, contending claimant failed to establish he suffered from a compensable occupational disease.

Claimant was employed by the Springfield fire department for 17 years. For the last 5½ years of that employment, he was a fire inspector with the rank of captain. Prior to becoming an inspector, he was an engine company captain. Claimant's duties as a fire inspector involved reviewing plans for fire protection and safety in new and remodeled buildings, responding to complaints of fire hazards in various facilities, and inspecting premises for violations of the fire code. Claimant testified that for the last four years of his employment, he experienced stress-related problems while on the job and sought help from Dr. Sutherland, a psychiatrist. Claimant experienced symptoms of disorientation and a panicky feeling as if he were falling out of a building. When these panic attacks occurred, claimant would have to catch his breath because he felt as if there were a rope around his neck and he could not breathe.

Claimant testified to difficulties in four general areas associated with his employment: workload, politics, interpretation of rules, and discrimination by supervisors.

WORKLOAD

In December 1987, another safety department inspector was transferred out of the unit. Claimant stated that he was required to assume the duties of the former employee in addition to his own. Claimant's normal territory involved Springfield's largest shopping center, White Oaks Mall; a smaller commercial development close to the mall, White Oaks Plaza; and a large area on the west and south side of the city into which numerous housing and building developments were being added. In addition, claimant coordinated two public service programs within the department and, on occasion, would be required to respond to complaints or emergencies anywhere within the city limits.

The duties added to claimant's workload after the other inspector's departure included all State-occupied buildings which were privately owned and all Illinois Bell telephone, AT&T, and Western Electric facilities in the city.

Because of the increased workload, claimant was unable to keep up with his paperwork and stated his increased anxiety made it hard for him to function. He testified that Chief Koke, an assistant fire marshal and one of claimant's immediate supervisors, would assign him additional properties not in his original district because, in Koke's words, the other inspectors in the department were incompetent and only claimant could handle the projects. Claimant stated he was also told by his other supervisor, Chief Beagles, that White Oaks Mall and White

Oaks Plaza were of sufficient size that they, alone, would be a full-time job for a single inspector.

Claimant testified that although new inspectors were brought into the department from time to time, claimant's workload was not decreased and, although he asked for relief, Chief Koke told him to take vacation or sick time. Claimant also stated that Chief Beagles told him, when claimant announced he was quitting his job, that Beagles was sorry to see claimant leave and realized the workload was stressful.

POLITICS

In 1987, an election was held for the director of the city Office of Public Safety, which oversaw the fire department. Although claimant was not active in politics, he supported the incumbent's rival. According to claimant, during the campaign, the director's campaign manager, who was not an employee of the department, approached claimant and told him to stop supporting the director's opponent because the director would be reelected, heads would fly, and claimant did not want his to be one of them.

Claimant testified that Chief Knox, head of the training division of the department, made a strong, personally derogatory "political and religious" comment to claimant. After this incident, claimant went to his doctor because he felt extremely stressed and had chest pains. Although Knox was subsequently verbally reprimanded for the comment, claimant also received a reprimand because he attempted to file a grievance with the city civil service commission, which did not have jurisdiction over Knox. This caused claimant additional stress.

APPLICATION OF BUILDING AND FIRE CODES

Claimant testified that throughout the period he was an inspector, there was confusion over whether the codes were being applied equally to all people. On one occasion, upon his return from vacation, claimant discovered that a newly constructed State-occupied but privately owned building had received a full occupancy permit despite a number of fire code violations. Claimant testified that Chief Koke told him that the chief had signed off on the building because its owner was losing interest because of the continued vacancy of the building. The owner was a politically active member of the Springfield community.

Claimant stated that the building code for the city was also not uniformly enforced and there was confusion between the building department and the fire department over which codes applied. On one occasion, while claimant was at a Presbyterian home conducting an inspection, the director of building supervisors for the city confronted

claimant and, in the presence of several other individuals, verbally abused claimant and the fire department about its application of the fire code rules to various structures.

## TRAINING

Claimant testified he repeatedly asked for permission to attend classes and receive schooling in various aspects of fire safety. These requests were always denied. Schools were conducted at a site in Maryland and would last from two to three weeks. Claimant stated that Chief Knox, the director of the training division, saw to it that claimant was not permitted to attend this academy. Other inspectors in the department, including some with less experience than claimant, had been permitted to attend various schools on several occasions. Claimant also stated that he requested to be transferred to the training division or public relations but that the request was denied. Claimant also stated he was told that transfers were granted only to people who had "schooling."

## ANALYSIS

On cross-examination, claimant admitted he was aware of the process for filing a grievance over Chief Knox's comments and that he purposely refused to follow this course because he did not believe that grieving under the union contract would end this type of harassment. Claimant also acknowledged that the building commissioner's comments to him at the Presbyterian home were directed against the entire fire department in general as much as they were against claimant personally. The fire safety division of the department and the building department never got along because of inconsistencies between the two city codes which could not be reconciled. Claimant admitted he was not the only inspector who was involved in disputes over the application or interpretation of these codes. Claimant also believed that too many favors were granted to politically active individuals. Finally, claimant acknowledged that Chief Koke would make derogatory comments about all employees in the department and that claimant was not singled out for this type of criticism.

Thomas Oseland, chief of the fire department, testified for respondent. The department is divided into three divisions: operations (fire fighters), safety (claimant's department), and training and education. Oseland testified that individual assignments to employees within any particular division could vary from day to day and cover a wide range of tasks with changes occurring on short notice. Claimant, according to Oseland, had not been assigned any duties that were not

assigned to all captains within the safety division. Oseland was also not aware of any request for a job change which claimant might have made. Claimant had been transferred to the safety department on his own request because claimant wanted a change from the on 24-hours off 48-hours on routine set for fire fighters.

Regarding the comment Knox made to claimant, Oseland stated that personal problems were something that were part of the job and if the employees could not work them out there was a formal grievance policy under the collective-bargaining contract for reviewing problems. As to politics, Oseland stated that during the previous election, not everyone in the department supported the incumbent. A number of employees openly supported the director's opponent and some were neutral. None of the employees who supported the challenger, however, were treated any differently after the election in which the incumbent was reelected. The director's campaign manager was not even a city employee.

Concerning schooling for inspectors, Oseland testified the ability to take a course depended on the type of school requested by the fireman, whether the department had the money to pay for the classes, and whether the Maryland facility had space to accommodate the request. Although Chief Knox would make a recommendation as to whether a particular fire fighter should be allowed to attend a particular school, Oseland had the final say over any request for schooling. Oseland, however, had never disagreed with Knox's recommendations. When a fire fighter was turned down for schooling, a reason for the rejection was set forth in writing and transmitted to the fire fighter. Oseland testified that claimant never discussed job stress with him and, to Oseland's knowledge, claimant had never been treated any differently than any other employee. Claimant was not exposed to any stress or tension that others in the department had not been exposed to.

On cross-examination, Oseland admitted he became chief of the department only shortly before claimant left the job and prior to that he had been chief of operations and had no contact with or supervision over claimant.

Oseland also stated it was not unusual for a fire fighter to be turned down for schooling again and again if the particular class or finances were not available. It would be unusual, however, if people with less seniority would receive additional training or schooling while someone with greater seniority would never be permitted to attend.

Oseland acknowledged that he and Chief Knox both supported the incumbent in the prior election and Knox's comment to claimant was in "bad taste." There were, in all probability, other verbal exchanges

which were just as bad which occurred between employees within the department. Serving in the fire department was stressful to all employees, and one of Oseland's roles as chief was to implement programs on how to handle stress. Oseland concluded that working in the fire safety division was not more stressful than working as a fire fighter risking one's life.

Howard Beagles, one of claimant's two immediate supervisors, testified that he worked for the department for 29 years. He assigned duties to the various inspectors, and each inspector had his own specific territory but might be called upon to take on additional assignments. Changes in the daily schedule would routinely be made on short notice because of emergencies or receipt of a complaint from someone who perceived a serious fire hazard in a particular building which needed immediate attention. These sorts of problems affected all employees within the division.

Beagles contradicted claimant by testifying that claimant did not receive all of the duties assigned to the inspector who had left the division in December 1987. Although some work was assigned to claimant, other work was parceled out to the other inspectors. Beagles testified that he suggested removing White Oaks Mall from claimant's duties because of the increased workload but that claimant rejected this offer because he preferred to keep the mall under his control.

Beagles also stated that the decision on who would be allowed to attend schools was made up the chain of command and all employees had been turned down on occasion and many had requests rejected a number of times. Beagles agreed there was significant disagreement between the fire safety division and the city building department over how their respective codes were to be administered. Beagles testified claimant was treated no differently from any other inspector and suffered no different strain or tension than that to which every other employee was subjected.

On cross-examination, Beagles could not remember how many times claimant had been turned down for schooling but did remember that claimant was accepted to one school. Claimant, after having been accepted, declined to attend telling Beagles he did not want to be away from his family for an extended length of time. Beagles admitted that the work of the fire safety division was described by many as "crisis management" and that overseeing White Oaks Mall could be a full-time job if the department had the luxury of personnel to staff such an arrangement.

Although claimant told Beagles about the aggravation and stress he was feeling and the anxieties and difficulties the workload was

causing him, Beagles stated he told claimant that if claimant had too many things to do, Beagles would assign another inspector to try to work with claimant on particular projects. The policy of reassignment, if one was overloaded, applied to everyone in the department and there was more work for the department than the limited number of employees could reasonably handle.

On the medical evidence presented, and the parties agree, claimant was suffering from both generalized anxiety and what was described as a classic panic disorder which was intermittently intense. The arbitrator awarded 18⁵/₇ weeks of temporary total disability. The Commission affirmed that decision and the circuit court confirmed the Commission's order.

In *Chicago Board of Education v. Industrial Comm'n* (1988), 169 Ill. App. 3d 459, 523 N.E.2d 912, this court was asked to consider whether on-the-job mental stress which results in emotional illness in the absence of physical trauma and sudden disablement traced to a definite time, place, or cause is compensable under the Workers' Occupational Diseases Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 172.36 *et seq.*). In concluding that certain emotional illnesses may be compensable under the Act, the court nevertheless observed that on-the-job stress, of itself, is not a disease and that events and conditions capable of producing stress exist in every employment environment. The court cautioned that there was a tenuous link in establishing a causal connection between a claimant's mental disability and the gradual mental stimuli which allegedly produced the disease in a situation where a person suffers a gradually developing mental disability which, in retrospect, is attributed to factors such as worry, anxiety, tension, pressure, and overwork without proof of a specific time, place, and event producing the disability.

Concern that the allowance of compensation for any mental disease or disorder caused by on-the-job stressful events might open a floodgate for workers who succumb to the everyday pressures of life, this court set guidelines for determining under what circumstances the Act permitted compensation for nontraumatically induced mental disorders.

■ Specifically, the court stated that if the nontraumatically induced mental disorders, due to a gradual deterioration of mental processes, are compensable a causal connection between the employment and the disability must be established by showing that the employment exposed the employee to an identifiable condition of the employment that was not common and necessary to all or to a great many occupations. Stated in different terms, we concluded that mental disorders

not resulting from trauma must arise in a situation of greater dimensions than the day-to-day emotional strain and tension which all employees must experience.

This court also found that not only must the conditions producing the disability be extraordinary, they must, from an objective standpoint, exist in reality, and it is not sufficient that the employee believes, although mistakenly, that the conditions exist. Finally, the court stated that the employee must prove that the employment conditions, when compared with the nonemployment conditions, were the "major contributory cause" of the mental disorder. *Chicago Board of Education*, 169 Ill. App. 3d at 466-68, 523 N.E.2d at 916-18.

In applying this test to the facts in this case, respondent contends claimant failed to show he was exposed to "a situation of greater dimensions than the day to day emotional strain and tension which all employees must experience" as required by our holding in *Chicago Board of Education*. We agree.

Claimant stated that his workload was excessive but admitted that everyone else's workload was heavy. There is no dispute that the amount of work to be accomplished by the department as a whole was greater than the staff could reasonably accommodate especially when, because of the nature of the job, emergencies or citizen complaints arose on an *ad hoc* basis.

Claimant further testified that he felt political pressure because he supported the incumbent director's opponent in the election. Yet there was testimony that others in the department also did not support the incumbent and no retribution was meted out to any employee, including claimant, following the election in which the incumbent was victorious.

Claimant testified he was unhappy over political favors which were allegedly being granted to politically active property owners as well as disputes between the city building division and the fire department over the administration of overlapping and sometimes inconsistent fire and building codes. These sorts of frustrations and conflicts, while real, are nothing more than the generalized sorts of problems which all employees encounter in applying government rules and partisan political considerations are nothing new to the domain of public employment.

Likewise, scurrilous remarks apparently made by one supervisor toward claimant were characterized by others as not uncommon in the workplace and, although in bad taste, were not considered "serious." Moreover, the particular remark which was directed at claimant was an isolated remark. In addition, claimant testified one of his supervisors

made derogatory remarks about employees all the time which were not directed solely at him. In fact, when certain of these comments were made, claimant was being told that he was being given extra work because he was the only one in the department qualified to handle the job because all of the other inspectors, but not claimant, were incompetent. It was not claimant's aptitude which was being criticized.

Finally, claimant testified he was never permitted to receive additional schooling although he conceded that others in the department were turned down regularly. We need not consider the conflict in the testimony on this point but note only that while this may have been a disappointment to claimant (as it probably was to others on the occasions when their requests for training were refused), there is no testimony that because of this lack of additional schooling claimant was unable to safely perform his tasks or that others' lives or property were put at risk.

A heavy workload, personal disputes between employees and supervisors, unfulfilled expectations, and political activity within the domain of public employment are endemic to claimant's occupation. Much like the fact of unruly students, an unresponsive administration, and the burdens of paperwork and record keeping faced by a teacher in *Chicago Board of Education*, the events to which claimant testified in this case are not out of the ordinary or of greater dimension than one might reasonably find in the normal workplace environment.

We have examined the evidence with care and agree that the employment in which claimant engaged subjected him and all other employees of the department to similar conditions capable of producing stress. Yet, these conditions are not unique to claimant's employment or, indeed, to claimant himself. Accordingly, we do not believe claimant has established that these conditions are uncommon to all or a great many occupations and, for that reason, has not satisfied the test for determining whether the condition qualifies as an occupational disease. For this reason, the judgment of the circuit court of Sangamon County confirming the Industrial Commission is reversed.

Reversed.

McNAMARA, WOODWARD, STOUDER, and LEWIS, JJ., concur.