LARRY GRAVES, Plaintiff-Appellee, v. PONTIAC FIREFIGHTERS' PENSION BOARD, Defendant-Appellant.

Fourth District   No. 4—95—0726

Argued March 6, 1996.—Opinion filed June 24, 1996.

Richard J. Puchalski (argued), of Sklodowski, Franklin, Puchalski & Reimer, of Chicago, for appellant.

David L. Stanczak (argued), of Dunn, Hundman & Stanczak, of Bloomington, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiff, Larry Graves, was a firefighter employed by the Pontiac fire department from 1973 until July 20, 1993, when he filed an application for a disability pension with the defendant, Pontiac Firefighters' Pension Board (Board). Plaintiff sought a line-of-duty disability pension pursuant to section 4—110 of the Illinois Pension Code (Code) (40 ILCS 5/4—110 (West 1992)) or, in the alternative, a not-in-duty disability pension pursuant to section 4—111 of the Code (40 ILCS 5/4—111 (West 1992)). After a series of hearings, the Board found plaintiff permanently disabled from performing the duties of a firefighter but found his disability not duty-related and awarded him a nonduty disability pension. On administrative review, the circuit court reversed the Board's decision and ordered it to grant a line-of-duty disability pension. Defendant appeals, alleging the circuit court erred in finding the Board's decision against the manifest weight of the evidence. For the reasons which follow, we reverse the order of the circuit court and reinstate the Board's decision.

■ The line-of-duty disability pension under section 4—110 of the Code provides:

"If a firefighter, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found, pursuant to Section 4—112, to be physically or mentally permanently disabled for service in the fire department, *** the firefighter shall be entitled to a disability pension of 65% of the monthly salary attached to the rank held by him." 40 ILCS 5/4—110 (West 1992).

A firefighter who becomes physically or mentally disabled from any cause other than from an act of duty shall be granted a disability pension of 50% of his monthly salary. 40 ILCS 5/4—111 (West 1992). A disability pension shall not be paid unless three physicians selected by the Board have determined by examinations that the firefighter is disabled, together with such other evidence the Board deems necessary. 40 ILCS 5/4—112 (West 1992).

In his disability application, plaintiff claimed he was physically or mentally disabled as a result of anxiety brought on by the increas-

ing demands for performance of emergency medical technician (EMT) duties and an incident of January 9, 1993, when he was required to use a defibrillator upon a friend in an unsuccessful rescue attempt. During the hearings respecting his application, plaintiff testified that over the past several years greater emphasis had been placed upon his EMT duties and the necessary training and certification became more intense. Plaintiff stated he felt less and less competent to handle the EMT calls and he began experiencing stress and anxiety two to three years prior to the incident of January 9. He never mentioned his growing anxieties to his chief and admitted that his responsibilities were no different than those of other firefighters. He could recall no specific incident where he felt incompetent to handle his duties.

Plaintiff testified that on January 9 he and other firefighters responded to an emergency call for a person found unresponsive. He testified he attempted to shock the victim with the defibrillator because the machine indicated a shockable rhythm, but he was unable to do so. Upon arrival at the hospital, he stated that a nurse looked at the defibrillator monitor which plaintiff carried and screamed there was a shockable rhythm. Plaintiff took this as criticism of his performance. Two other firefighters at the scene, Mark Corrigan and Duane Beal, testified they did not recall any conversation between plaintiff and the hospital staff, and Corrigan testified that he himself operated the defibrillator on the victim. Plaintiff consulted his personal physician at the end of January 1993 because he was depressed, felt worthless, and had no energy. He was referred to Drs. Douglas Bey and Mel French, both psychiatrists, and admitted to the hospital psychiatric ward in April 1993.

Pursuant to statute, plaintiff consulted with three additional psychiatrists selected by the Board. In concluding that plaintiff was disabled, the Board cited from those reports.

Dr. Anthony D'Agostino's medical report indicates:

"[Plaintiff] reported that his difficulties began about two years ago with the gradual increase of what he calls 'medical calls.' Prior to that time he had spent most of his career doing firefighting but now he reports that during the last three or four years that approximately 90% of what he is doing are what as he referred to as 'ambulance calls.' He has never liked doing medical work and has always felt particularly anxious about having to treat medically ill persons but somehow he managed to cope in the past because these calls were much less frequent. He recalls that he's always had an aversion to dealing with people in medical situations and states that he's always protected himself by avoiding what he refers to as 'Personal contacts with patients.' In

recent years he feels the job has become more and more demanding with respect to these medical emergencies and these have become [*sic*] to bother him more and more.

\* \* \*

It should be noted however that [plaintiff] has reported that the administering of medical treatment has *always* been a source of distress to him but that he, in the past, was able to shrug off the annoying feelings associated with medical treatment because such demands were made upon him much less frequently. In the last few years, if what he says is correct, there has been a shift in the kinds of demands made on him with the result that increasing numbers of calls are now specifically for such medical treatment which has resulted in a corresponding increase in his distress. Put it another way, these feelings of aversion have *always been present* but have been allowed to reach a point of disablement in his case because the frequency of these contacts have increased in the last few years. This, at least, is what he reports and in absence of evidence to the contrary his current disability does appear to be the result of those cumulative effects." (Emphasis in original.)

The medical report of Dr. Stanley Abramski indicates:

"Currently, his self confidence has eroded to the point of total disability in his performance as an EMT. In view of the gradual progression of symptoms and the chronic stress of dealing with severe physical and emotional trauma as an EMT, I believe the work as an EMT has been causal. Although the patient has had personal problems: [*i.e.*], chest pains, early cataracts, one divorce, two marriages, profound exogenous obesity and problem drinking, I feel that these are not major contributors to his psychiatric disability and current condition."

The medical report of Dr. Kuna indicates:

"[Plaintiff] says that he has been depressed for about the last $2\frac{1}{2}$ years and that these symptoms have worsened over time, getting much worse since January of this year. He relates this depression to the stress of dealing with the medical aspects of his job. Apparently in his city, all fire fighters are used as paramedics. As the sophistication of this has grown, [plaintiff] has become more and more involved with medically ill and dying patients. [Plaintiff] says he finds this very difficult.

\* \* \*

As far as causality, [plaintiff] does seem to relate his depression with his job stress in rather equivocal terms. He says that this was major stress and it was temporally related to the onset of his illness. Yet, it is often impossible to make an absolute cause and effect determination (with any patient). At the least, I would say that his job stress was a strong contributing factor in the development of his depression.

Other factors that could be explored are his depended [*sic*] personality traits and a conflicting history that might suggest a problem with alcohol abuse/dependence."

The Board noted that the question of psychological stress under article 4 of the Code was one of first impression (see 40 ILCS 5/4—110, 4—111 (West 1992)) and it turned for guidance to cases of psychological disability decided under article 3 of the Code, involving police disability pensions (see 40 ILCS 5/3—114.1, 3—114.2 (West 1992)). In each of those cases the line-of-duty disability was denied because the psychological disability was not causally connected to specific acts of duty unique to police work. See *Ryndak v. River Grove Police Pension Board*, 248 Ill. App. 3d 486, 490, 618 N.E.2d 606, 608-09 (1993) (employee claimed that in 22 years on the police force he had been shot at, witnessed traumatic deaths, been beaten by an offender, and was diagnosed as suffering from stress, anxiety, and depression. In affirming the denial of a line-of-duty disability, the court noted that stress and depression "as a result of the violent nature of police duties are problems related to the general nature of being a police officer and not to a specific act of police service"); *Batka v. Board of Trustees of the Village of Orland Park Police Pension Fund*, 186 Ill. App. 3d 715, 717-18, 542 N.E.2d 835, 836-37 (1989) (employee's disability was related to criticisms by his superior and resentments toward his peers); *Wall v. Police Pension Board*, 178 Ill. App. 3d 438, 444, 533 N.E.2d 458, 462-63 (1988) (employee's stress disorder resulted from disillusionment with police work and failure to advance in his career); *Olson v. City of Wheaton Police Pension Board*, 153 Ill. App. 3d 595, 599, 505 N.E.2d 1387, 1390 (1987) (employee's stress was caused by conflicts with his superiors, departmental charges brought against him and reassignment as a patrol officer); *Rentfrow v. Police Pension Fund*, 170 Ill. App. 3d 744, 745, 525 N.E.2d 176, 177 (1988) (police chief's mental disability resulted from a federal investigation of his personal conduct and not from acts performed as a police officer). The Board concluded that the psychological stress plaintiff suffered was general in nature and resulted from "job dissatisfaction not attributable to specific acts of service as a firefighter or the cumulative effects of such acts." It discounted the only specific act of duty identified, the incident of January 9, based on the greater credibility it accorded firefighters Corrigan and Beal: neither could recollect any criticism directed at plaintiff by hospital staff and Corrigan testified that he had operated the defibrillator on the victim.

The circuit court in administrative review found that both parties agreed plaintiff was disabled and entitled to a pension—the only disputed issue was causation, *i.e.*, whether his disability resulted

from an act or acts of duty pursuant to statute. The court enumerated several of the Board's findings it determined were not supported by the evidence and concluded the Board ignored the manifest weight of the evidence, indicating plaintiff's depression and job stress were specifically related to ever increasing demands placed upon firefighters to provide sophisticated medical treatment as part of their job duties. The court noted that all the medical testimony related plaintiff's disability to the chronic stress he experienced in the performance of his EMT duties and the statutory language did not require the acts of duty to be "unique." It distinguished the line of police disability cases relied on by the Board by noting that none were related to specific acts of police service. In contrast, the court noted that the plaintiff had demonstrated that the events of January 9 constituted a specific act of duty and were the culmination of his existing insecurities and apprehensions arising not from his traditional firefighting duties but from the additional sophisticated medical duties imposed over the past several years.

■ There is no dispute that plaintiff is psychologically disabled. The question formulated by the circuit court was whether plaintiff was disabled as a result of an "act of duty" or the "cumulative effects of acts of duty." The question thus phrased suggests that the circuit court undertook a *de novo* review of the evidence and made independent credibility determinations regarding the January 9 incident. However, on administrative review, the findings and conclusions of an agency on questions of fact are held to be *prima facie* true and correct. 735 ILCS 5/3—110 (West 1992). The court will not reweigh the evidence or upset credibility determinations but instead will determine whether the pension board's decision is against the manifest weight of the evidence. *Ryndak*, 248 Ill. App. 3d at 490, 618 N.E.2d at 609; *Murdy v. Edgar*, 103 Ill. 2d 384, 391, 469 N.E.2d 1085, 1088 (1984). A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary or not based upon the evidence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242 (1996).

■ Plaintiff essentially argues he is entitled to a duty-related disability pension because he became disabled as a result of the January 9 incident or from the cumulative effects of performance of EMT duties, which are part and parcel of job responsibilities regularly and customarily required of all firefighters. He identifies no single traumatic event, other than the January 9 incident, which was discounted by the Board on the basis of the more credible testimony by Corrigan and Beal, nor any series of identifiable events or acts of duty which engendered his disability other than a general aversion

to EMT duties. However, general job dissatisfaction or job stress arising from the inability to handle general duties does not give rise to a duty-related disability pension. See *Trettenero v. Police Pension Fund*, 268 Ill. App. 3d 58, 67, 643 N.E.2d 1338, 1344 (1994) (employee's disability resulted from feelings of alienation in the workplace and not a specific act of duty as a police officer); *Wall*, 178 Ill. App. 3d at 444, 533 N.E.2d at 462-63; *Rydnak*, 248 Ill. App. 3d at 489-90, 618 N.E.2d at 608. All of the medical reports indicate plaintiff's aversion to performance of the medical aspects of his job. While these *aspects* of his duties are stressful to him and may have caused or contributed to his psychological disability, the Board could reasonably have concluded that stress or depression resulting from general employment functions inherent in the occupation and common to all firefighters was not the equivalent of the specific acts of duty contemplated by the statute. Any form of employment might engender stress, even potentially disabling stress, whether the employee be a firefighter, a police officer, or many other enumerable occupations.

■ In this case, evidence of record indicates plaintiff had substantial personal and health problems unrelated to his occupation. The additional stress and pressure of performing certain functions of his occupation he did not like may have also caused or contributed to his disability. However, we cannot find the Board's conclusion that plaintiff failed to present evidence of specific acts of duty, as opposed to day-to-day functions common to all firefighters, as causative of his mental disability to be against the manifest weight of the evidence.

As further support for this conclusion, we have reviewed cases decided under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1992)), which similarly provides disability benefits to employees disabled in work situations. In *Chicago Board of Education v. Industrial Comm'n*, 169 Ill. App. 3d 459, 467, 523 N.E.2d 912, 917 (1988), the court rejected the view that job-induced anxiety, stress, or depression resulting in a mental disorder that developed, not from a specific traumatic event, but from conditions of the workplace to which all employees are subject, was a compensable disability under the Act. See also *City of Springfield v. Industrial Comm'n*, 214 Ill. App. 3d 301, 307-08, 573 N.E.2d 836, 840-41 (1991) (mental disorders not resulting from trauma or objectively extraordinary conditions of the particular occupation are not compensable under the Act).

■ As a final matter, at oral argument in this case we requested the parties to brief the issue of this court's jurisdiction over the instant appeal for which the Board filed a notice of appeal on

September 5, 1995. At the conclusion of the evidence, the trial court on April 8, 1995, entered an order that the case was taken under advisement and the court would rule by mail. On June 20, 1995, the trial court entered its final order on the merits but through an oversight neither of the parties received a copy of the judgment. When this fact was subsequently brought to the court's attention, it entered a new order acknowledging its oversight and providing that the June 20, 1995, order would be final for purposes of appeal as of August 21, 1995, the date copies of the order were mailed to counsel for each of the parties.

Supreme Court Rule 303(a)(1) provides that notices of appeal from final judgments must be filed within 30 days after entry of the judgment being appealed. 155 Ill. 2d R. 303(a)(1). In *Mitchell v. Fiat-Allis, Inc.*, 158 Ill. 2d 143, 632 N.E.2d 1010 (1994), the supreme court held that the appellate court lacked jurisdiction over a judgment order which had been reentered by the trial court some two months following its original rendition because the parties were unaware of its existence. The *Mitchell* court reasoned that even though counsel for appellant had not received actual notice of entry of judgment, counsel was required to monitor the progress of the case to ensure that appeals were timely filed. *Mitchell*, 158 Ill. 2d at 150, 632 N.E.2d at 1013.

Here, unlike *Mitchell*, the circuit court entered an order expressly providing that it would rule by mail. The order subsequently entered on June 20, 1995, was not mailed to the parties and therefore did not comport with the provisions of the earlier order. Under such circumstances, the June 20, 1995, order did not become final for purposes of appeal until mailed by the circuit court on August 21, 1995. Therefore, the notice of appeal filed September 5, 1995, was within the 30-day requirement of Supreme Court Rule 303(a)(1) and the Board's appeal was timely.

The order of the circuit court is reversed and the Board's decision reinstated.

Reversed; Board's decision reinstated.

COOK, P.J., and KNECHT, J., concur.