GENERAL MOTORS PARTS DIVISION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Hillie Walton, Appellee).

First District (Industrial Commission Division)   No. 1—87—0360WC

Opinion filed February 24, 1988.—Rehearing denied May 20, 1988.

Ferbend & Ferbend, of Chicago, for appellant.

Kaplan, Sorosky & Anderson, of Chicago, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Respondent appeals from an order of the Industrial Commission (Commission) which awarded benefits to claimant for a psychological injury suffered after his supervisor verbally assaulted him with profane, racial slurs. Claimant maintains he suffers from debilitating depression because of the insult to which he perceives he has been subjected. At issue is whether claimant established he suffers from a compensable psychic injury.

The facts are largely undisputed. Claimant graduated from high school in approximately 1940. He served in the infantry from 1943 to 1949, and received a battlefield commission to staff sergeant during the war. He was hired by the respondent in 1966 as a "picker-packer." This job required the processing of orders by selecting parts from inventory, matching them against computer cards, and packing them in a box for shipment.

At the hearing before the arbitrator claimant testified that in April of 1977 his wife was hospitalized. He asked the personnel director, John Price, if he could change from the second to first shift so he could be with his wife during the evening hours to administer medication. Price refused the request because it was not in conformity with company policy. Claimant testified he made a second similar request in June of 1977 which was again denied.

On August 17, 1977, claimant approached his foreman, Bill Pretner, about the issue. Pretner talked to Price and later told claimant Price again refused the requested shift change because Price did not want to "open up a keg of nails."

The following day, as claimant came on duty, he encountered Price in the area of the time clock at the entrance to the respondent's facility. A number of other workers also coming on duty or leaving after the first shift were in the area. Claimant and Price are both black. Claimant testified he approached Price and asked him, allegedly in nonbelligerent tones, what he meant by not wanting "to open up a keg of nails." According to claimant, Price became outraged, responding with a highly charged invective punctuated by obscene and racial

remarks. Price then ordered claimant into Price's office along with foreman Pretner, who was nearby. A security guard at the plant entrance asked Price to control himself and Price apologized to the security guard. When Price entered his office with claimant in tow, Price kicked over several chairs. When claimant asked Price why he was being cursed, Price ordered claimant back to work on the threat of being fired.

Claimant testified he left the office, punched in, and went to work. After the incident claimant stated he felt "real bad" and "less than a man" to let another man do that to him. He worked his shift without incident, however. After his shift ended he bought a bottle of Chivas Regal at 7 a.m., drank half of it during the day, and took the remainder to work with him. Prior to the incident, claimant maintained he was a moderate drinker, imbibing only on weekends or on occasion when he and his wife went out to dinner.

After working his complete shift the following day, a Friday, he purchased another fifth of Chivas Regal, which he promptly drank. He continued drinking over the weekend and remained at home crying.

When he returned to work on Monday he discovered he was wearing the same clothes he had worn on Friday. During the days and months that followed, claimant maintained he was ridiculed by coworkers, who laughed and poked fun at him for his failure to stand up to Price. During that same period claimant stated his drinking increased to a point at which he was consuming 1½ fifths of Chivas Regal every 24 hours. This behavior continued for several years.

Claimant continued to work his regular shift until February 3, 1978, when he was injured falling down a flight of steps at his niece's home. Following that incident he never returned to work. He was admitted to Loretto Hospital on March 5, 1978, where he remained for five days for treatment of injuries to his back, leg, and neck stemming from the fall.

In November of 1978, claimant began treatment with a psychiatrist, Dr. Gaynor, at Loyola Hospital. Claimant testified he had great difficulty sleeping and was told by his personal physician in May of 1978 to seek psychiatric help. He nevertheless waited until November of that year to make his first appointment. Claimant saw Gaynor every two weeks until November of 1979 when he moved to Georgia. He continued treatment in Georgia under the care of a different psychiatrist. Over the course of treatment claimant indicated he began to feel better and eventually stopped drinking heavily. He continues to take two separate medications relating to depression and two other

medications for high blood pressure. According to claimant his condition has rendered him unable to do anything other than help with household chores. Claimant's memory is fuzzy and he forgets details. He cannot concentrate because he constantly thinks about the incident with Price. He dreams about it and believes he has been done a grievous wrong.

On cross-examination claimant acknowledged that shift transfers were made on a rotation basis and because he had turned down one transfer opportunity he was not eligible for a shift change according to company policy.

Other than an injury he suffered between 1976 and 1977 claimant could not remember suffering any other work-related injuries. Claimant was then confronted with his application for adjustment of claim and settlement for an industrial injury occurring February 2, 1978, the day before he fell at his niece's home.

Claimant acknowledged he never told the doctors he was drinking a fifth and a half of whiskey a day. He also did not recall being laid off for disciplinary reasons in 1977 although the company records reflected otherwise. He acknowledged a long history of medical treatment for hypertension and admitted it was possible he missed work during 1977 because of this condition.

Lillian Walton, claimant's wife, testified that prior to August 18, 1977, claimant was happy with his work and always went to work dressed neatly. Claimant only drank socially and was never drunk prior to that date. Claimant came home that day with a bottle of whiskey and proceeded to drink it, something he had never done before. Claimant began crying constantly. Claimant's wife tended to corroborate claimant's testimony that after the incident he drank heavily, his grooming both at home and at work deteriorated, and he was depressed and cried much of the time. She also stated claimant stopped going to work early to mingle with co-workers prior to his shift, which had been his habit.

Thomas Chapman, a co-worker on the same shift, testified on claimant's behalf. Chapman witnessed the argument between claimant and Price. Afterward, claimant looked sad. Before the incident claimant's appearance was always neat. Afterward he became sloppy in his manner of dress. Chapman observed claimant drinking whiskey in the factory washroom. He also saw claimant being "called down" for doing his work in an improper manner on a number of occasions after August 18, 1977. Chapman admitted, however, claimant fulfilled his quota at work because if he had not done so his employment would have been terminated.

Isaiah Hatcher, another co-worker on the same shift, also witnessed the incident. He testified claimant was clean cut and well groomed prior to August 18, 1977, but not thereafter. Claimant felt hurt and ashamed after the encounter but refused to talk about it.

Hatcher observed claimant in the bathroom at the plant several days after the incident. Claimant was standing in an open stall holding a gun. He was solemn and shaking and stated he should kill Price for what he had done. Hatcher convinced him to put the gun away.

Hatcher, too, observed claimant making numerous mistakes in his work after August 18, 1977. Hatcher also observed others in the plant kidding claimant. Claimant became withdrawn and did not mingle with his co-workers.

John Price, the personnel administrator, testified denying claimant ever requested a transfer prior to August 17, 1977. On that day Pretner, the foreman, talked to him about changing the shift of a different black female employee. Price explained an exception could not be made because the employee was not at the top of the transfer list. Price acknowledged making a statement to Pretner to the effect that such an accommodation would be like "trying to open up a can of worms."

Price also acknowledged the confrontation with claimant. He testified claimant approached him in a belligerent manner, coming nose to nose with Price. Claimant swore at Price indicating his displeasure with Price's practice of letting whites transfer from shift to shift but not blacks. Price called claimant a liar and acknowledged making the statements attributed to him by claimant. Price, however, maintained his statements were made in a conversational tone of voice and after he explained the shift policy to claimant in Price's office, claimant apologized, they shook hands and parted company amicably. When asked, on cross-examination, why he made these statements Price indicated he was resented by blacks for the way he performed his job and was called an "Uncle Tom." He also stated the phrasing he used in his statement to claimant was street jargon and common in the factory. He intended his statements in the presence of other co-workers to be a message to other blacks to get off his back.

None of claimant's treating physicians were deposed. However, claimant submitted the evidence deposition of Sheldon Greenburg, a board-certified psychiatrist. Greenburg examined claimant on one occasion in 1981 along with prior written statements made by claimant, his co-workers, and hospital records from Loretto and Loyola Hospitals and claimant's Georgia psychiatrist.

Greenburg found claimant sleepy, and overly sad and depressed.

His attention span and ability to concentrate were diminished. His memory was fuzzy on details. He felt humiliated, had a diminished sense of self-esteem, and felt personal inadequacy and a loss of face. According to Greenburg the incident with Price had become an obsession with claimant. It was Greenburg's opinion claimant's depression was based, in part, on this incident. Greenburg maintained the incident caused a narcissistic injury to claimant which damaged his self-image.

On cross-examination, Greenburg acknowledged that physical problems, such as diabetes and arthritic pain and high blood pressure could also cause depression. Greenburg also agreed that osteoarthritis of the cervical spine, cartilage damage to the knee, and other back and neck injuries could have contributed to the depression. Claimant's drinking and the fact that a brother had recently died from diabetes could also be a source of depression. Greenburg stated it was possible that a combination of all of these factors produced claimant's depression although it was unlikely. Greenburg also did not find it significant that claimant worked continuously for 5½ months after the incident without interruption.

Respondent introduced the evidence deposition of Alex Arieff, a board-certified psychiatrist. He examined claimant the day before Greenburg and also reviewed the records of claimant's treating physicians, a personal history of claimant and employment documents. Based on his review, Arieff's diagnosis was depression with "inappropriate affect." Arieff was of the opinion there was no relationship between the alleged cause of claimant's depression and his present state of ill-being. This opinion was based on Arieff's belief that the single incident with Price was not sufficient to cause the problems claimant faced. Arieff thought it more likely claimant's physical ailments, hypertension, arthritis, and alcohol abuse brought on his condition. Arieff found it significant that claimant continued to work for 5½ months after August 18, 1977. Had the incident been significant to claimant's depressive condition it should have triggered an immediate psychiatric disability which would have necessitated immediate treatment. Arieff also found significant claimant's prior military experience, which included heavy combat and a battlefield commission under fire. This indicated claimant could withstand the ordinary psychological insults of life. Arieff was of the belief the trauma to claimant's body caused by the fall down the flight of stairs in February 1978 could have acutely aggravated claimant's mental disability.

On cross-examination, Arieff was questioned about the diagnosis of claimant's treating physician, Dr. Gaynor. Gaynor found claimant

suffered from "involutional melancholia," which is a term of art denoting mid-life depression usually occurring in women in their forties and fifties and occasionally in men. According to Arieff, this type of depression is not caused by any external force or producing cause. It is a temporally based type of depression which becomes acute during middle age although such patients normally have a prior history of depression or other psychiatric problems. At the time in question, claimant was in his midfifties.

Arieff testified this type of depression could not be brought on by a specific incident but such could worsen or aggravate a preexisting state of depression. Arieff admitted there were psychiatrists "of credibility" who believed the failure to relieve anger or frustration by acting out immediately can exacerbate depression. Arieff was not of this school, however.

Arieff explained that every patient finds something he believes is responsible for his troubles but this is not the cause of depression. If the patient continues to focus on particular incidents he can become more depressed. The condition is equivalent to being delusional.

Both doctors did not believe claimant was a malingerer and both felt claimant's feeling of humiliation was real although delusional.

Also admitted into evidence were certain medical and employment records. Although claimant had testified he maintained a good attendance record and his wife stated he normally went to the plant early, his work history reflected numerous absences and tardy attendance throughout the course of his employment with respondent.

The intake records at Loretto Hospital for March of 1978 indicate claimant then suffered from possible cervical radiculopathy, lumbosacral strain, degenerative arthritis and chronic anxiety—depression. The only other reference to anxiety was an apparent statement by claimant, recorded by the hospital personnel, that he was suffering from nervousness and forgetfulness which created difficulties in work relationships. There is no indication in the report that claimant told hospital personnel about the incident with Price or claimant's alleged gross consumption of alcohol. Finally the hospital records do not indicate any treatment was administered for claimant's anxiety.

Also admitted were two letters from a physician who examined claimant at the request of respondent in May and August of 1978. During the first examination claimant complained to the doctor of pain in the neck and head, headaches, pain in the low back area and legs, difficulties with claimant's left knee, pain in both shoulder joints, lack of feeling in the left hand, and an inability to remember or concentrate. It was the doctor's opinion there was nothing preventing

claimant from returning to work at that time although claimant continued to state he was sick and could not move about. The doctor raised the question of whether claimant's unwillingness to return to work was a functional one. Upon a follow-up examination in August of 1978 the doctor found little change in claimant's condition, stating the issue was whether claimant had any motivation to return to any gainful occupation.

Also admitted was a letter addressed "To whom it may concern" from claimant's general practitioner. The letter, dated September 1, 1978, discussed in general terms claimant's physical problems with his back, knee, and his hypertension. The letter also contained a statement to the effect claimant related that for several months he had experienced an increasing inability to sleep as well as increased feelings of depression due to his constant pain and financial problems.

Notes from the treating psychiatrist, Dr. Gaynor, indicate claimant apparently told Gaynor that although he remained angry because of what Price had done, he was also quite upset about his arthritic condition, which he deemed to be the cause of his inability to return to work, not his depression.

The arbitrator denied benefits on the basis claimant failed to prove he sustained a compensable, accidental injury. Upon review, the Commission reversed the arbitrator and awarded $170.23 per week for the period of 275\1/7 weeks of temporary total incapacity. On review, the decision of the Commission was confirmed by the circuit court.

In Illinois, recovery for mental incapacity resulting from a work-related injury has long been held to constitute a compensable injury. Where a claimant has suffered an accident causing incapacity for work, it is immaterial that the incapacity exists by reason of a mental disorder rather than a physical one, providing the disability resulted from the injury. (*Veritone Co. v. Industrial Comm'n* (1980), 81 Ill. 2d 97, 405 N.E.2d 758.) Prior to 1976, however, it was universally accepted in this State that mental disability was compensable only if it was precipitated by physical contact or injury traceable to a definite time, place and cause.

In 1976 the supreme court issued its opinion in *Pathfinder Co. v. Industrial Comm'n* (1976), 62 Ill. 2d 556, 343 N.E.2d 913, in which, for the first time, the court permitted recovery for psychological disability absent physical trauma or injury. In *Pathfinder*, a female employee fainted and suffered severe emotional trauma immediately after she extracted the severed hand of a co-worker from a punch press which had amputated the co-worker's hand up to the wrist. After ex-

amining the foreign precedent permitting recovery for nontraumatic mental disability the supreme court stated:

"We must conclude that an employee who, like the claimant here, suffers a sudden, severe emotional shock traceable to a definite time, place and cause which causes psychological injury or harm has suffered an accident within the meaning of the Act, though no physical trauma or injury was sustained." (62 Ill. 2d at 563, 343 N.E.2d at 917.)

At issue in this appeal is whether the facts of this case justify an award under the rationale in *Pathfinder*.

■■ Initially, respondent maintains *Board of Education v. Industrial Comm'n* (1981), 83 Ill. 2d 475, 416 N.E.2d 237, stands for the proposition that the use of obscene and racist language by a superior to a subordinate employee, even in shouting tones, does not constitute a severe emotional shock as a matter of law. We disagree. In *Board of Education*, the *pro se* claimant testified, among other things, co-workers were vulgar and would stand over her and shout at her, using obscene and racist language which resulted in mental disability. The supreme court refused recovery on the basis claimant's testimony was the only evidence supporting the existence of her injuries. Her complaints were all subjective and there was no objective evidence which supported an inference of either injury or disability. She presented no medical testimony and hers was the only evidence connecting her alleged nervous disorder with her employment. In that case the supreme court held only that claimant's evidence was not sufficient to establish the claimed disability. The supreme court did not hold that such conduct could never support an award assuming the disability and causal connection were proved.

■■ Respondent next asserts that, as a matter of law, claimant has failed to prove by competent proof any aspect of the test announced by the supreme court in *Pathfinder*. Respondent argues claimant must prove the incident constituting sudden or severe shock would cause an adverse psychological reaction in "a person of ordinary sensibilities." The language which respondent draws from the *Pathfinder* opinion to that effect appears in the supreme court's summary of the evidence and conclusion that the evidence of disability present in that case was not against the manifest weight. At most the ostensible requirement that the injured individual be one of normal sensibility is *dictum*, or, more precisely, one aspect of how the trier of fact evaluates the validity of the claim given the legitimate concern voiced by the supreme court that such psychic injuries can be easily fabricated or exaggerated. It is not an element of the *Pathfinder* test

which must be proved as a matter of law before recovery will be permitted.

Respondent also argues claimant failed to prove he suffered a sudden, severe emotional shock traceable to a definite time, place and readily perceivable cause within the meaning of *Pathfinder*. Claimant maintains he need only establish he was exposed to an emotional trauma which can be said to have played a part in or been a cause of the resulting mental disability from which he suffers. Claimant reads the supreme court's opinion in *Pathfinder* to sweep broadly and permit compensation for any mental disability which can be traced, in part, to any nonphysical traumatic work-related incident. We disagree.

■ While mental stimulus, such as fright, shock, or excessive unexpected anxiety resulting in injury might justify a compensation award, the present claim goes far beyond the parameters established in *Pathfinder*. We do not read *Pathfinder* to permit recovery for every nontraumatic psychic injury from which an employee suffers merely because the employee can identify some stressful work-related episode which contributes in part to the employee's depression or anxiety. In *Pathfinder*, the court predicated an award on the fact the event triggering the disability was horrific and the injury immediate and substantial. (*DeAdwyler v. Industrial Comm'n* (1981), 86 Ill. 2d 106, 427 N.E.2d 560.) We conclude the supreme court's decision in *Pathfinder* is limited to the narrow group of cases in which an employee suffers a sudden, severe emotional shock which results in immediately apparent psychic injury and is precipitated by an uncommon event of significantly greater proportion or dimension than that to which the employee would otherwise be subjected in the normal course of employment. In our view, anxiety, emotional stress or depression which develops over time in the normal course of an employment relationship does not constitute a compensable injury within the holding of *Pathfinder*. Compensation for nontraumatic psychic injury cannot be dependent solely upon the peculiar vicissitudes of the individual employee as he relates to his general work environment.

■ Upon this basis we conclude claimant has failed to establish, as a matter of law, he suffered a compensable injury within the meaning of *Pathfinder*. The episode which allegedly precipitated the disability involved an argument between a supervisor and an employee over working conditions, something not uncommon in the normal workplace environment. Moreover, according to claimant's own testimony his efforts to secure a shift change had been rebuffed on at least three prior occasions by the personnel manager. Claimant knew of the company's shift-change policy and knew that he was not eligi-

ble for a shift change when he confronted the personnel manager. Under the circumstances, an adverse, an even angry response to claimant's continued challenge to his supervisor's personnel decisions might well have been anticipated. Although the invective directed at claimant was beyond the bounds of polite discourse, there was also unrebutted testimony that the language employed was street jargon commonly used in the factory by the workers. Under the facts of this case, we conclude claimant has failed to establish the verbal abuse he suffered, albeit unpleasant, was anything other than an ordinary incident of employment which is not uncommon to and might well be encountered in a great many occupations.

Moreover, we conclude claimant failed to establish his disability flowed from the confrontation with the personnel director. Following the argument claimant went to work, completed his shift, and continued to perform his duties for the next 5½ months until he injured his back in a fall in February of 1978. In addition, claimant sought no treatment for his mental condition until November of 1978, 15 months after the argument at work and almost six months after his personal physician suggested he seek help. There was also significant evidence of contradictory statements made by claimant as to the source of his depression. These included his own physical, family, and financial conditions. Finally, although claimant's examining physician testified his condition was due, in large part, to the incident with the personnel manager, claimant's own treating physician diagnosed claimant as suffering from involutional melancholia which was described by respondent's expert as a form of male menopause caused in significant part by the fact of growing older.

Although claimant points to his testimony and that of his wife and co-workers to the effect he immediately began drinking heavily, became unkempt in appearance, and became reclusive and distraught, this must be balanced against the fact he continued to function successfully in the workplace until an unrelated physical injury caused him to cease working. On the whole, claimant's evidence supports a finding his breakdown was caused by a gradual deterioration of his mental processes brought on by a variety of factors, not a single, work-related event or stimulus. Such an injury, as we have indicated, is not the immediately apparent severe reaction to an exceptionally distressing stimulus upon which liability for compensation was predicated in *Pathfinder*.

In sum, we conclude *Pathfinder* authorizes an award of benefits only when an employee suffers a sudden severe emotional shock which produces immediate disability and is caused by an uncommon

nontraumatic work-related experience out of proportion to the incidents of normal employment activity. Claimant has failed to establish such a disability in this case as a matter of law.

Accordingly, the judgment of the Cook County circuit court and decision of the Industrial Commission are reversed.

Reversed.

BARRY, P.J., and McNAMARA, WOODWARD, and CALVO, JJ., concur.