# Illinois Official Reports

## Appellate Court

*Moran v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 151366WC

| | |
|---|---|
| Appellate Court Caption | SCOTT MORAN, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (The Village of Homewood, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division<br>Docket No. 1-15-1366WC |
| Filed | July 29, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2014-L-050679; the Hon. Robert Lopez Cepero, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Thomas W. Duda, of Palatine, for appellant.<br><br>Rusin Maciorowski & Friedman, Ltd., of Chicago (Daniel W. Arkin and Jeffrey N. Powell, of counsel), for appellee. |
| Panel | JUSTICE STEWART delivered the judgment of the court, with opinion.<br>Presiding Justice Holdridge and Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion. |

¶ 1 The claimant, Scott Moran, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)) against his employer, the Village of Homewood, seeking workers' compensation benefits for post-traumatic stress disorder (PTSD) allegedly caused by a March 30, 2010, work-related accident. After an arbitration hearing, the arbitrator found that the claimant did not sustain an accidental injury that arose out of and in the course of his employment.

¶ 2 The claimant sought review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission). The Commission struck one sentence from the arbitrator's decision and otherwise affirmed and adopted her decision.

¶ 3 The claimant filed a timely petition for judicial review in the circuit court of Cook County. The circuit court confirmed the Commission's decision, and the claimant appealed.

¶ 4                                   BACKGROUND

¶ 5 The following factual recitation is taken from the evidence presented at the arbitration hearing on January 7, and September 13, 2013.

¶ 6 The claimant testified that he started working as a firefighter in 1986. On February 22, 1991, he went to work for the employer's fire department as a firefighter/paramedic. In 2006, he was promoted to lieutenant/paramedic.

¶ 7 The claimant testified that just before 9 p.m. on March 30, 2010, a call came into the fire station, reporting a man trapped in a chair in a house fire. On the way to the fire, the dispatcher told him that the police were on the scene and that they were unable to rescue the man. The Hazel Crest fire department arrived on the scene minutes before the claimant arrived with his fire engine and crew. He testified that, under the Incident Command System, a single person is responsible for the overall operation of an incident. He was told by radio to take command of the incident. He went to the front door and saw the Hazel Crest firefighters enter the house. He determined the gauge of hose to use in extinguishing the fire. He instructed firefighter Christopher Kieta to take the hose in the front of the house. He listened to the radio for another chief to come on the radio so he could transfer command and go in with Kieta. As he was putting on his mask and getting ready to go in, Brian Carey came up to him and stated, "we got this Lieu. We got this." "Lieu" was a reference to lieutenant. Carey and Kieta went inside. The claimant testified that he looked around the house and that the fire in back was worse than he had originally thought, and he noticed that no one was on the roof ventilating. A Flossmoor fire department lieutenant arrived, and the claimant told him to vent the house. The claimant escalated the alarm to a "full still" so that additional mutual aid companies would respond to the scene.

¶ 8 The claimant testified that, as he walked back around to the front of the house, there was a flash. He saw Kieta and firefighter Karra Kopas come out of the building, and Kopas started screaming that Carey was still in the house. After what "seemed like hours," the claimant saw firefighters drag Carey out. He was not wearing his mask or helmet. The claimant looked down and said "Oh, my god." The ambulance at the scene had been driven by Carey and, therefore, was not available to transport him to the hospital. The claimant escalated the alarm to a mayday and called to secure an ambulance from a mutual aid department. The claimant continued to

supervise the scene and obtain medical care for Carey. As Carey was being transported to the ambulance, Chief Casper from Country Club Hills approached the claimant and relieved him of his command. After Carey had been transported to the hospital, Chief Robert Grabowski came up to the claimant and asked what happened. The claimant told him "Chief, it's real bad. [Carey's] hurt. It's bad. You got to go to the hospital." Chief Grabowski left for the hospital.

¶ 9        Chief Grabowski testified that he had worked for the employer's fire department as the chief for 3½ years. Prior to that, he had worked for the Village of Hazel Crest for 23 years. Chief Grabowski testified that shortly after he arrived at the fire on March 30, 2010, Chief Dunn of the Tinley Park fire department approached him and told him that there was probably a line-of-duty death. Chief Grabowski told the claimant to have the crew return to the station along with all the other initial responders. From his training, and as fire chief, he knew that after this type of accident it was important to get everyone into one area to begin the critical incident stress debriefing. A little less than two weeks after the incident, there was another debriefing at the village hall.

¶ 10       The claimant testified that he and the other first responders from the employer's fire department were transported by the police to the police training room where clergy and other support staff interacted with them. Carey died as a result of his injuries caused by the fire. A critical incident stress debriefing team was brought in to assist the first responders in coming to grips with the loss of a colleague. For approximately 10 days after the March 30, 2010, fire, the employer's fire department ceased performing fire suppression and emergency medical service operations, and all of its calls were referred to mutual aid companies.

¶ 11       Chief Grabowski testified that after the fire they implemented the emergency operation plan where surrounding fire departments provided coverage for a period of about one week. It had never been used before. He stated that because they are a small department and some of the firefighters were very close to Carey, he had concerns about the responders involved in the fire. He and Deputy Chief Clint Johnson spoke to psychologist Dr. Timothy McManus, and they decided not to take calls to make sure all the employees were okay.

¶ 12       Deputy Chief Johnson testified that he had worked full-time for the employer's fire department since 1979 and had been deputy chief since 2008. He testified that after the March 30, 2010, fire, it was the first time in his career that the fire department had all their calls taken by other fire departments.

¶ 13       Christopher Kieta testified that he worked as a firefighter/paramedic for the employer and that he was part of the crew that responded to the March 30, 2010, fire. He stated that the claimant ordered him to pull a 2½-inch line hose into the house through the front door. He entered the house and made his way toward the kitchen. When he started extinguishing the kitchen fire, a huge amount of steam conversion erupted, touching the exposed skin around his face and pushing him to the ground. As he tried to pull his hood up, he bumped into Carey. He asked Carey to take the hose while he fixed his hood. He backed up behind Carey and bumped into Kopas. He asked Kopas to back Carey up so he could adjust his helmet and hood. He fixed his hood and noticed that they were pulling on the line. He picked up the hose and started maneuvering it forward. When he was in the front room about three feet from the front door, he heard breaking glass, and there was a flashover.[1] He heard someone on the radio ordering

_____

[1]A flashover is the sudden spread of flame over an area and the rapid transition to a fully developed fire.

everyone out of the house. The Hazel Crest firemen rushed out, and he got pushed out the door. The Hazel Crest firefighters grabbed Kopas and pulled her out. He informed the Hazel Crest crew that Carey was still in the building. He went to his engine to get another hose line. He passed the second line to the Hazel Crest firefighters and followed them in the house. About 10 feet into the structure, they found Carey. Carey was carried into the yard, where emergency personnel began administering aid. Kieta stated that he was transported to the fire station for a traumatic debriefing session.

¶ 14 The claimant testified that he went to the fire station on April 9, 2010, to do work for his position as pension board secretary. Chief Grabowski called him into his office and stated that he could not return to work until he was cleared by a psychiatrist.

¶ 15 The employer selected Dr. McManus to treat some of the firefighters involved in the March 30, 2010, fire. An e-mail from the claimant to Chief Grabowski dated April 20, 2010, was admitted into evidence. The claimant wrote that he had sent an e-mail to Deputy Chief Johnson on April 12, 2010, requesting the name and number of the psychiatrist chosen to evaluate the firefighters. He had requested an appointment with the doctor the next day and had been denied. He wrote that he had e-mailed Deputy Chief Johnson again for the information about the doctor and had received no response. He closed, "In the interest of preserving my mental status and recognizing signs of PTSD I have arranged to begin seeing Dr. Slutsky."

¶ 16 Chief Grabowski's response e-mail dated April 20, 2010, was admitted into evidence. He wrote that he received "word yesterday that [the claimant was] able to see Dr. McManus." He stated that it was important that the claimant seek help as needed and that he would be scheduled with Dr. McManus as soon as possible.

¶ 17 The claimant testified that, on referral from his attorney, he made an appointment to see psychiatrist Dr. Marc Slutsky, on May 5, 2010. He then received Dr. McManus's contact information and began treating with him on April 23, 2010. He stated that this was the first time he had received mental health treatment. The claimant testified that he treated with Dr. McManus to deal with his inability to get his mind off the fire, his difficulty sleeping, and his interactions with other people including his family.

¶ 18 Licensed clinical psychologist Dr. McManus testified by evidence deposition. His records were also admitted into evidence. He testified that he received a referral from Chief Deputy Johnson to assess several firefighters, including the claimant, who were involved in the March 30, 2010, fire. He stated that he first saw the claimant for an assessment on April 23, 2010. In his notes, Dr. McManus wrote that the claimant expressed significant frustration with the referral process. The claimant reported a mixture of feelings of guilt about the fire, the burden of his responsibility as supervisor for the death, feelings of abandonment by his supervisors, sleep difficulties, and dreams about the event. Dr. McManus stated that the claimant was guarded and that it was difficult to engage him in the therapeutic process. He diagnosed the claimant with acute stress disorder.

¶ 19 On May 5, 2010, Dr. McManus diagnosed the claimant with PTSD. He wrote in his patient notes that the claimant seemed "lost and tremendously burdened." Dr. McManus testified that the change from acute stress disorder to PTSD is a natural progression diagnostically and that PTSD is not diagnosed within the first 30 days of when an individual experiences any kind of trauma.

¶ 20 Dr. McManus testified that his fourth session with the claimant was a turning point in the therapy. They worked together to facilitate a less guarded response to sessions and to begin to

use the sessions in a way that would benefit the claimant. Dr. McManus explained that the claimant was not the kind of person who spoke about his feelings and that getting him to verbalize emotions showed a change in the trust level and a willingness to be more engaged in the therapy process. He felt that the claimant was showing signs of subtle improvement emotionally, in managing his stress, and in his sleep patterns.

¶ 21 On June 4, 2010, Dr. McManus administered a personality and assessment inventory called the MMPI-RF to the claimant to determine the claimant's progress. He testified that the test results indicated that the claimant experienced a traumatic event; that there was mild distrust of the process; that the claimant was showing good control over his anxiety, mood, and any depressive affect; and that the claimant had made sufficient progress to consider returning to work. Dr. McManus testified that he determined that effective June 14, 2010, the claimant could return to work as long as he remained in therapy. He testified that the claimant's PTSD symptoms were stable, meaning that the claimant's symptoms were not disrupting his functioning or interfering with his relationships.

¶ 22 Dr. McManus testified that, at the August 26, 2010, session, he and the claimant discussed a visual flashback the claimant had while driving with his son. Dr. McManus stated that the event was psychologically significant because it showed that the fire was significantly or powerfully coded within the claimant's memory structures. He stated that the flashback indicated that the fire had impact and power for the claimant and that a picture of the event could surface under a very relaxed condition or a nonguarded condition. They discussed the meaning of the flashback and its significance.

¶ 23 Dr. McManus continued to treat the claimant in September and October 2010. Dr. McManus testified that the claimant formally returned to work between the October 25 and November 9, 2010, sessions. During the November sessions, they discussed the claimant's condition after he returned to work, coping mechanisms, and sleep difficulties at the fire station.

¶ 24 On December 21, 2010, Dr. McManus released the claimant from treatment. He felt that the claimant had transitioned back to work successfully. Dr. McManus told the claimant that he could return for treatment if he experienced any difficulties.

¶ 25 Dr. McManus testified that he treated the claimant again on January 11, 2011. The claimant returned because there were things at the fire station that triggered memories of Carey and caused him to think about Carey's death. The claimant expressed difficulty shutting the thoughts off and struggled with feelings of conflict and guilt about the accident. The claimant testified that he asked Dr. McManus if the flashbacks were ever going to end and whether it would get better or worse. Dr. McManus testified that he told the claimant that his responses to the cues in the firehouse were normal, and they reviewed some thought-stopping exercises and how to turn the cues from adverse to more positive. The claimant testified that he never had comparable mental experiences prior to the March 30, 2010, fire.

¶ 26 Dr. McManus testified that it was not unusual that the claimant experienced symptoms once he had returned to work because he was in a setting where he was reminded of the March 30, 2010, fire on a daily basis, nor was it unusual that the claimant continued to think about the event over and over. Dr. McManus testified that the claimant would continue to have ruminations, thoughts about the event, or flashbacks after therapy even though they did not affect his ability to work.

¶ 27    Psychiatrist Dr. Marc Slutsky testified by evidence deposition. He testified that the claimant was referred by his attorney as a possible patient for psychotherapy. On May 4, 2010, Dr. Slutsky conducted a psychiatric evaluation of the claimant. Dr. Slutsky testified that the claimant told him about the March 30, 2010, fire and described his initial terror, his feelings of responsibility, his guilt for the deployment of personnel within the fire, his guilt that in commanding he was not in the fire himself, the shock of seeing one colleague killed and another injured, his feelings of fear and anxiety, the terrifying thoughts that were dominating his thinking, and the recurrent reliving of the fire. He discussed how this led him to be withdrawn and more irritable and angry. He also expressed how frightened he was that he would be locked in this state and wanted help.

¶ 28    The claimant did not become a patient, but Dr. Slutsky saw him again on February 8, and November 2, 2012. He testified that, when he first met the claimant in 2010, "his almost consummate focus was on the terror, the fear, the anxiety, the panicky state." The claimant was in a post acute stress situation and was very much all consumed by it. By 2012, his symptoms of flashbacks, episodes of stimulation that brought the incident to mind, general irritability and discomfort, and change in sleep patterns were more compatible with PTSD. He went from a totally consuming state to where the episodes were triggered by specific people or things that reminded him of the accident or spontaneous sporadic episodes. Dr. Slutsky stated that, in February 2012, the claimant had significantly improved in his ability to function, even though he had significant signs of PTSD, including tremendous elements of irritability, difficulty relating, isolation, flashbacks, and other symptoms. The claimant had a somewhat improved sense that he could use the tools of self-reflection, withdrawal, relaxation, and limitation of interaction to lessen the intensity of his symptoms. Dr. Slutsky testified that, when he saw the claimant in November 2012, the claimant's symptoms were more encapsulated, meaning that they were more specifically episodic, they had more definitive beginnings and ends, and they were less severe and more easily controlled.

¶ 29    Dr. Slutsky testified that the event of March 30, 2010, caused the claimant to suffer an overwhelmingly traumatic experience, in which he witnessed and was confronted with a life-threatening experience, and he experienced overwhelming feelings of horror, helplessness, fear, and guilt. Dr. Slutsky stated that the claimant suffers from a number of symptoms, including recurrent intrusive recollections, images of experiences, flashbacks, dreams, and insomnia. The claimant withdraws from social interactions; he does not feel comfortable being relaxed at the fire station; he has a pessimism he did not have before, there are times he is overly worried and irritable, and he has difficulty concentrating. Dr. Slutsky diagnosed the claimant with chronic PTSD based on the fact that the claimant had an exposure to a sudden, unusual, traumatic event, and the fact that, over a period of time, he developed symptoms in a number of different patterns, including hypervigilance, withdrawal, insomnia, flashbacks, horrible nightmares, and intrusive thoughts. Dr. Slutsky stated that PTSD is an evolving response and that the diagnosis often does not manifest itself in any form for weeks, months, or even years after the trauma. He stated that the claimant's profession did not alter his diagnosis. Dr. Slutsky testified that people like firefighters or paramedics develop coping methods to deal with deaths in fires or automobile accidents, but when something happens that is of an extraordinarily different nature, such as when a colleague dies in a fire, it presents a totally different situation. He testified that, within a reasonable degree of medical and psychiatric certainty, the claimant's diagnosis of PTSD was caused by the March 30, 2010, events.

¶ 30    The claimant described his flashbacks as recurring visions that popped into his head throughout the day for no reason. He said he had six or seven different flashbacks but the most prominent were visions of firefighters dragging Carey from the fire, emergency personnel carrying Carey off on a stretcher, and Carey's funeral. The claimant testified that he continues to have multiple flashbacks each day; he is unable to sleep at the firehouse; and he does not sleep well at home. Since being released by Dr. McManus, he has been able to go to fires and on emergency medical calls and has been able to function as a lieutenant despite the flashbacks and trouble sleeping.

¶ 31    The arbitrator found that the claimant did not prove that he sustained accidental injuries that arose out of and in the course of his employment with the employer and, therefore, awarded no benefits. She noted that the claimant had an adverse emotional reaction stemming from the March 30, 2010, fire. She found that he had not experienced a sudden, severe emotional shock because he did not sustain a physical injury, he did not witness Carey's death, and he was not involved in rescue efforts. She found that the proper interpretation and evaluation was to compare the claimant with other firefighters, rather than with the public in general. She found that this case was similar to cases that did not allow recovery for nontraumatic psychic injury where the employee could identify a stressful work-related episode, but his injury was dependent on his peculiar vicissitudes as he related to his work environment. She awarded the employer a credit of $7477.30 for temporary total disability benefits paid to the claimant. She found all other issues moot.

¶ 32    The claimant sought review of the arbitrator's decision before the Commission. The Commission affirmed and adopted the arbitrator's decision, striking the following sentence: "The Arbitrator also notes that the cases are employment specific and, in the context of firefighters and police officers, establish a trend to deny recovery for post-traumatic stress disorder to first responders." The claimant sought judicial review of the Commission's decision in the circuit court. The circuit court confirmed the Commission's decision, and the claimant appealed.

¶ 33                                                    ANALYSIS

¶ 34    The claimant argues that the Commission's decision that he did not sustain an accident that arose out of and in the course of his employment with the employer on March 30, 2010, is contrary to law. The parties differ on the standard of review. The claimant argues that the only question is the application of law to the undisputed facts, and therefore, the Commission's decision should be reviewed *de novo* and set aside. The employer argues, on the other hand, that there are disputed facts or conflicting inferences that can be drawn from the facts and the Commission's decision should not be disturbed unless it is against the manifest weight of the evidence. We agree with the employer.

¶ 35    The disputed issue presented in this case is whether the claimant suffered a sudden, severe emotional shock during the March 30, 2010, fire that produced a psychological injury. The employer argues that the claimant did not suffer a sudden, severe emotional shock because he was not inside the house when the flashover occurred, he did not see Carey or Kopas sustain their injuries, and he did not seek treatment on his own accord. The claimant argues that he did suffer a sudden, severe emotional shock because he was at the scene of the fire in a position of command and he did seek treatment on his own accord. When the facts are in dispute or conflicting inferences may be drawn from the facts, this court will not disturb the

Commission's decision unless it is against the manifest weight of the evidence. *Chicago Transit Authority v. Illinois Workers' Compensation Comm'n*, 2013 IL App (1st) 120253WC, ¶ 24, 989 N.E.2d 608. A decision is against the manifest weight of the evidence only where an opposite conclusion is clearly apparent. *Id.* "Although we are reluctant to conclude that a factual determination of the Commission is against the manifest weight of the evidence, we will not hesitate to do so when the clearly evident, plain, and undisputable weight of the evidence compels an opposite conclusion." *Mlynarczyk v. Illinois Workers' Compensation Comm'n*, 2013 IL App (3d) 120411WC, ¶ 17, 999 N.E.2d 711.

¶ 36 In *Pathfinder v. Industrial Comm'n*, 62 Ill. 2d 556, 562, 343 N.E.2d 913, 916 (1976), the supreme court addressed the question of whether an employee can recover for psychological disability when the accident caused no physical injury. The court held that an employee who suffers a sudden, severe emotional shock traceable to a definite time, place, and cause, which causes psychological injury or harm has suffered an accident within the meaning of the Act, though no physical trauma or injury was sustained. *Id.* at 563, 343 N.E.2d at 917. This is known as the mental-mental theory of recovery. *Diaz v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 120294WC, ¶ 23, 989 N.E.2d 233.

¶ 37 In the instant case, the Commission found that "the proper interpretation and evaluation is to compare the petitioner in the present case with other firefighters, rather than the general public." The Commission found that the case was similar to *General Motors Parts Division v. Industrial Comm'n*, 168 Ill. App. 3d 678, 522 N.E.2d 1260 (1988). In that case, the employer appealed from the Commission's order awarding benefits to the claimant for a psychological injury suffered after his supervisor verbally assaulted him with profanity and racial slurs. *Id.* at 679, 522 N.E.2d at 1260. The appellate court found that *Pathfinder* does not "permit recovery for every nontraumatic psychic injury from which an employee suffers merely because the employee can identify some stressful work-related episode which contributes in part to the employee's depression or anxiety." *Id.* at 687, 522 N.E.2d at 1266. The court held that "*Pathfinder* is limited to the narrow group of cases in which an employee suffers a sudden, severe emotional shock which results in immediately apparent psychic injury and is precipitated by an uncommon event of significantly greater proportion or dimension than that to which the employee would otherwise be subjected in the normal course of employment." *Id.* The court found that the claimant's condition was not the immediately apparent severe reaction to an exceptionally distressing stimulus which, pursuant to *Pathfinder*, constituted a compensable injury. *Id.* The court found that the claimant failed to establish that the verbal abuse he suffered, though unpleasant, was anything other than an ordinary incident of employment that was not uncommon to and might well be encountered in a great many occupations. *Id.* at 688, 522 N.E.2d at 1266. The court also found that the claimant failed to establish that his disability flowed from the confrontation and that the evidence supported a finding that his breakdown was caused by a gradual deterioration of his mental processes brought on by a variety of factors, not a single work-related event or stimulus. *Id.*, 522 N.E.2d at 1266-67.

¶ 38 In *Diaz*, this court clarified the holding in *General Motors*. In *Diaz*, the claimant, a police officer, responded to a disturbance call and was approached by an individual who pulled a gun and pointed it at the claimant. *Diaz*, 2013 IL App (2d) 120294WC, ¶¶ 4-5, 989 N.E.2d 233. The claimant did not realize until some later time that the gun was a toy gun. *Id.* ¶ 5. Backup was called and the individual returned to his home, where an extended standoff occurred. *Id.*

¶¶ 5-6. Until the individual was restrained, the almost 40 officers present at the standoff considered him armed and dangerous. *Id.* ¶ 7. Three days later, the claimant had a panic attack, and he was subsequently diagnosed with PTSD. *Id.* ¶¶ 8-9. The Commission applied the narrow construction of *Pathfinder* as expressed in the *General Motors* decision. *Id.* ¶ 26. The Commission acknowledged that the claimant's encounter with an individual armed with a gun presented a dangerous and precarious situation but denied compensation because the traumatic event was not an uncommon event of significantly greater proportion than he would otherwise have been subjected to in the normal course of his employment as a police officer. *Id.* ¶ 30.

¶ 39    The claimant appealed, and this court considered whether the Commission held the claimant, a police officer, to a unique standard of "severe emotional shock" not otherwise applicable to employees in other lines of work, rendering its decision contrary to law. *Id.* ¶ 22. The court found that the claimant's psychological harm was compensable under the Act. *Id.* ¶ 34. The court held that the phrase "an uncommon event of significantly greater proportion or dimension than that to which the employee would otherwise be subjected in the normal course of employment" was used in *General Motors* to distinguish compensable claims from a mental disability that arises from the ordinary job-related stress common to all lines of employment. (Internal quotation marks omitted.) *Id.* ¶ 31. The court noted that it is well established that mental disorders not arising from a severe emotional shock must arise from a situation of greater dimension than emotional strain and tension all employees experience from worry, anxiety, pressure, and overwork. *Id.* The court found that the claimant did not develop a mental disability attributable to factors such as worry, anxiety, tension, pressure, overwork, and the emotional strain all employees experience but, instead, experienced a severe emotional shock traceable to a specific time, place, and event that produced his disability. *Id.* The court held that "whether a worker has suffered the type of emotional shock sufficient to warrant recovery should be determined by an objective, reasonable-person standard, rather than a subjective standard that takes into account the claimant's occupation and training." *Id.* ¶ 33.

¶ 40    In the present case, the employer argues that the claimant did not suffer a severe emotional shock on March 30, 2010. The employer argues that the claimant was not involved in the traumatic event because he was not inside the house, he was not involved in the flashover, he did not sustain a physical injury, he was not involved in the rescue of Carey or Kopas, he was not involved in the efforts to resuscitate Carey, and he did not witness the death of Carey or the burns sustained by Kopas. The claimant's presence outside the house does not preclude the event from being traumatic. The claimant was in command of the fire. He instructed the crew on where to enter the house and what gauge hose to use. He planned to go inside the house when Carey told him "we got this," and he opted to remain outside to command. He escalated the fire alarm to a "full still." He saw Carey dragged from the house. Because there was no ambulance readily available, he secured an ambulance. He supervised the scene and obtained medical care for Carey. When Chief Grabowski arrived at the scene, the claimant informed him that Carey was badly injured and that he should go to the hospital. Carey died from injuries sustained in the fire.

¶ 41    The death of a coworker had not previously occurred during the claimant's career. Due to the traumatic nature of the March 30, 2010, event, the first responders were taken from the fire to the police station for critical incident stress debriefing. For approximately 10 days after the fire, the employer's fire department ceased performing fire suppression and emergency medical service operations, and all of its calls were referred to mutual aid companies. Deputy

Chief Johnson stated that he had worked for the employer's fire department since 1979, and it was the first time in his career that the fire department had its calls taken by mutual aid companies. Chief Grabowski testified that this emergency operation plan had never been used before and was instituted after he and Dr. McManus determined that it would be best to help the firefighters deal with the trauma and come to grips with the fire and Carey's death. None of the firefighters involved in the March 30, 2010, fire were allowed to return to work until he or she had been cleared by a mental health professional. Extraordinary steps were taken to help the claimant and his fellow firefighters deal with the trauma of the March 30, 2010, events. Additionally, Dr. Slutsky testified that although firefighters and paramedics develop coping mechanisms to deal with deaths in fires and automobile accidents, the death of a colleague in a fire is an event of an extraordinarily different nature. Clearly, this is not the kind of event that an employee would be subject to during the normal course of employment.

¶ 42    The claimant's condition was not a gradual deterioration of his mental processes brought on by a variety of factors but a single, work-related event. Dr. McManus noted that the claimant had feelings of guilt about the fire and felt the burden of responsibility for Carey's death because of his command role. Dr. McManus testified that he administered a personality and assessment inventory test to the claimant, and it indicated that the claimant had experienced a traumatic event. Dr. Slutsky testified that the claimant had feelings of responsibility; guilt for the deployment of personnel within the fire; guilt that in commanding he was not in the fire itself; and shock from seeing one colleague suffer fatal injuries and another suffer serious burns. Dr. McManus diagnosed the claimant with PTSD caused by the trauma of the March 30, 2010, event. He stated that the claimant's August 26, 2010, flashback showed that the fire was powerfully coded within the claimant's memory structure. Dr. Slutsky testified that, within a reasonable degree of medical and psychiatric certainty, the claimant's PTSD was caused by the March 30, 2010, events. No conflicting medical evidence was presented. The claimant's condition was a severe reaction to an exceptionally distressing emotional shock.

¶ 43    The employer argues that the claimant's delay in seeking psychological treatment calls into question whether he sustained an accidental injury on March 30, 2010. In *Chicago Transit Authority v. Illinois Workers' Compensation Comm'n*, 2013 IL App (1st) 120253WC, ¶ 20, 989 N.E.2d 608, the court examined whether a claimant's psychological injury must be immediately apparent to recover for traumatically induced mental-mental injuries.

¶ 44    In *Chicago Transit Authority*, the claimant was driving a bus through an intersection when a passenger from the back of the bus shouted that someone chasing the bus had been hit. *Id.* ¶ 6. The claimant stopped the bus, exited, and saw a man lying near the curb. *Id.* The man was removed from the scene by ambulance. *Id.* ¶ 7. While at the employer's garage completing an accident report, the claimant was informed that the accident victim had died. *Id.* ¶ 8. She was shaken up and had flashbacks and trouble sleeping but did not seek professional help for two months. *Id.* ¶¶ 8-11. She was diagnosed with an adjustment disorder with mixed anxiety and depressed mood. *Id.* ¶ 11. The Commission found that the claimant proved she sustained psychological injuries arising out of and in the course of her employment, and the employer appealed. *Id.* ¶¶ 13-15. The employer argued that the claimant could not recover because her psychological injury was not immediately apparent. *Id.* ¶ 18. The appellate court rejected the assertion that to recover for traumatically induced mental-mental injuries the psychological injury must be immediately apparent. *Id.* ¶ 20. The court held that "if the claimant shows that

- 10 -

she suffered a sudden, severe emotional shock which caused a psychological injury, her claim may be compensable even if the resulting psychological injury did not manifest itself until some time after the shock." *Id.*

¶ 45    In the instant case, the claimant suffered an accidental injury on March 30, 2010. On April 12, 2010, the claimant sought the name of a psychiatrist from Deputy Chief Johnson. In an e-mail to Chief Grabowski dated April 20, 2010, he again sought help in obtaining psychological treatment and indicated that he was having symptoms of PTSD. He began treatment with Dr. McManus on April 23, 2010. The claimant sought help less than two weeks after the accident and began treatment less than one month after the accident. In *Chicago Transit Authority*, the claimant did not seek psychological treatment for two months. *Id.* ¶ 23. Here, although the claimant's psychological injury was not immediately apparent, he, like the claimant in *Chicago Transit Authority*, suffered a sudden, severe emotional shock, which caused a psychological injury that manifested itself some time after the shock.

¶ 46    The March 30, 2010, accident arose out of and in the course of the claimant's employment, and his condition of ill-being was causally related to the accident. He was responding to a fire and was in command of the fire. He determined what gauge hose should be used and instructed the firefighters where to go to fight the fire. After the house flashed, he witnessed Carey being dragged from the house and assisted by locating an ambulance and obtaining medical care. Carey died as a result of the fire. The claimant was treated by Dr. McManus and Dr. Slutsky, who both diagnosed him with PTSD attributable to the March 30, 2010, events. No conflicting medical evidence was presented.

¶ 47    The employer's actions following the March 30, 2010, fire indicate that it believed the first responders suffered a sudden, severe, emotional shock of greater dimension than emotional strain and tension all employees experience from worry, anxiety, pressure, and overwork. Due to the traumatic nature of the event, all first responders returned to the station for critical incident debriefing. For the first time in the history of the fire department, the department ceased performing fire suppression and emergency medical service operations and referred all calls to mutual aid companies for a period of approximately 10 days. This decision was made by Chief Grabowski and Deputy Chief Johnson after consultation with Dr. McManus. The defendant was not permitted to return to work until cleared by Dr. McManus, who the employer hired to treat firefighters involved in the March 30, 2010, fire.

¶ 48    The Commission's decision that the claimant did not sustain accidental injuries that arose out of and in the course of his employment with the employer is against the manifest weight of the evidence. The claimant's psychological injuries stemmed from a single, traumatic event on March 30, 2010, and he is entitled to recover for his psychological disability.

¶ 49    The claimant also argues that the Commission's determination that he failed to provide proper notice was against the manifest weight of the evidence. The Commission did not make such a finding. While notice was a disputed issue, the Commission did not address the issue, finding that, because the claimant did not prove an accident, the remaining issues were moot. Because the case must be remanded, the issues the Commission determined moot, including notice, should be addressed at that time.

¶ 50    The claimant also argues that the Commission's decision to award the employer credit for temporary total disability benefits was against the manifest weight of the evidence. The Commission did award the employer a credit of $7477.30 for temporary total disability benefits paid to the claimant. The decision contains no analysis or reasoning for this award. As

this matter must be remanded, the issue of the credit for temporary total disability benefits should be addressed on remand.

¶ 51       The claimant also argues that the Commission's decision not to admit his exhibit No. 4 into evidence was error. The claimant's exhibit No. 4 was a photograph taken of the resuscitation efforts on Carey, with the claimant in the left-hand margin. The employer objected on the ground that no foundation had been laid. The arbitrator rejected the exhibit. The evident purpose for offering the photograph into evidence was to show that the claimant was present at the scene of the traumatic event. Since we are reversing the Commission's determination that this claim is not compensable based on the other evidence in the case, we need not address this issue.

¶ 52                                        CONCLUSION

¶ 53       For the foregoing reasons, the judgment of the circuit court of Cook County, confirming the decision of the Commission, is reversed and the cause is remanded to the Commission.

¶ 54       Reversed and remanded.