2020 IL App (2d) 190713WC-U
No. 2-19-0713WC
Order filed November 18, 2020

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

Workers' Compensation Commission Division
_____

| | | |
|---|---|---|
| CITY OF ELGIN, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County, Illinois |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-MR-632 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION *et al.* | ) | Honorable |
| | ) | Thomas A. Meyer, |
| (Gregory A. Schneider, Appellee). | ) | Judge, Presiding. |

_____

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Barberis concurred in the judgment

**ORDER**

¶ 1    *Held*:    By finding that the petitioner suffered a sudden, severe emotional shock traceable to a definite time, place, and cause which resulted in a psychological injury, the Illinois Workers' Compensation Commission did not make a finding that was against the manifest weight of the evidence.

¶ 2    Petitioner, Gregory A. Schneider, was a police officer employed by respondent, the City of Elgin (Elgin). The Illinois Workers' Compensation Commission (Commission) found he had sustained a psychological injury, post-traumatic stress disorder, in subduing a prisoner who was trying to escape. The Commission ordered Elgin to pay temporary total disability benefits,

temporary partial disability benefits, and medical expenses. Elgin sought judicial review. The circuit court of McHenry County confirmed the Commission's decision. Elgin appeals. We disagree with Elgin that the Commission's decision is against the manifest weight of the evidence, although, at Elgin's request, we make a minor modification in the amount of temporary partial disability benefits. Therefore, we affirm the circuit court's judgment, which confirmed the Commission's decision, except that we reduce the amount of temporary partial disability benefits by $223.05.

¶ 3                                I. BACKGROUND

¶ 4       On March 17, 2012, Schneider was assigned to transport two prisoners to the courthouse in Rolling Meadows, Illinois, for the Saturday morning bond call. He was running late. He cuffed their hands in front of them, instead of behind their back, so that they would be as comfortable as possible and would not request him to pull over to adjust their handcuffs. He had them climb into the backseat of a squad car that was equipped with a grill separating the backseat from the front seat. Then he set off for Rolling Meadows. It was just he and the two prisoners.

¶ 5       Schneider was driving north in the righthand lane of Illinois Route 53, at 65 miles per hour, when one of the prisoners began kicking the rear passenger-side window with his bare feet. As Schneider was slowing down the squad car and pulling onto the right shoulder, the prisoner succeeded in kicking out the window and dived out of the squad car. Somehow, the prisoner ended up in front of the squad car, in the righthand traffic lane. Schneider pulled the squad car across the traffic lanes to protect the prisoner, who was lying on the highway. Unable to get radio reception, Schneider called 911 on his cell phone. The prisoner stood up. Schneider drew his pistol and ordered him to stay where he was. About three or four cars per minute were going by on both sides of the squad car at 35 to 40 miles per hour. At some point, according to Schneider's testimony, his

legs were brushed by a passing vehicle. The prisoner ran to another car, which was stopped in traffic on the righthand shoulder, and tried to enter that car, pulling first on the driver-side door handle and then on a passenger-side door handle. Both doors were locked, and the prisoner was unable to get in. Schneider tried to spray the prisoner with pepper spray, but the prisoner took off running again. Fearing that the prisoner might reach a neighboring commercial area, Schneider fired his pistol at him three times, striking him twice in the back. The prisoner rolled down a grassy area and stayed put. He survived his gunshot wounds.

¶ 6    Ambulances and other police units arrived. Schneider testified that his heart was racing and that he was fatigued and unable to catch his breath. Paramedics took Schneider to the emergency room of Northwest Community Hospital, where Schneider was diagnosed with acute stress disorder and was discharged in stable condition, with no work restrictions.

¶ 7    From March 18 to April 1, 2012, Schneider was on administrative leave, with full salary. He testified that, during that period, he was anxious, depressed, and fidgety; had difficulty sleeping; and was distant toward his three-month-old child.

¶ 8    On April 2, 2012, Schneider sought follow-up treatment from his family doctor, Dr. Shital Tanna. He reported to Dr. Tanna that he was worried about the criminal investigation and internal affairs investigation that almost certainly would be initiated. Also, it seemed to him that he had not yet " 'emotionally recovered from the event.' " Specifically, he complained of mood swings; a loss of pleasure and interest in daily activities, such as interacting with his son; a dulling of his powers of memory; and difficulty staying asleep. Four to six times in the night, he woke up, often in a sweat. His wife had been complaining that he was impatient, restless, irritable, and overreactive to trivial things. Dr. Tanna diagnosed post-traumatic stress disorder, for which she prescribed medication. But she wrote a note that Schneider was medically able to return to work.

¶ 9     On April 19, 2012, upon referral from Dr. Tanna, Schneider began receiving counseling from a licensed clinical professional counselor, Karen S. Chesney. He described to her his symptoms. He told her he could not help reliving the shooting incident in his head and that, whenever he did so, his powers of concentration were dissipated. He woke up repeatedly in the night. He lacked energy. He was forgetful. He was anxious and easily frustrated and yelled more often than he used to. He felt paranoid.

¶ 10    On June 18, 2012, Dr. Tanna re-examined Schneider. The medication she had prescribed, Effexor, seemed to be improving Schneider's mood. His wife reported that he was still having slight mood swings, but Schneider thought he was now more in control of his emotions. Although he was still having night sweats and occasional restlessness and fatigue, he now was taking more pleasure in parenting and family life. His ability to concentrate had returned. Dr. Tanna refilled the Effexor, with plans to taper the medication in three months, and she advised Schneider to continue his counseling sessions with Chesney. Dr. Tanna wrote that Schneider was "medically stable" and that he "appeared to be healing well." She deemed him capable of returning to his regular duties as a police officer.

¶ 11    On July 27, 2012, Schneider saw Dr. Tanna again. He was still in counseling and had been taking his medication. He was concerned that his symptoms, instead of going away, had reached a plateau. Also, he was in a dilemma: if he took his medication in the morning, he had anxiety at night, but if he took his medication at night, he had uncontrolled symptoms during the day. Schneider now was wondering if he should see a psychiatrist. Dr. Tanna increased the medication and referred him to a psychiatrist.

¶ 12    On August 28, 2012, Elgin issued to Schneider a notification of administrative charges. It appeared that he had violated rules of the police department by (1) failing to cuff the prisoners'

hands behind their backs and (2) using potentially deadly force against a prisoner when the circumstances did not so warrant. Three days later, Elgin served upon Schneider a warning that he was under administrative investigation and that he would be formally interrogated under oath.

¶ 13　On September 5, 2012, Dr. Tanna re-examined Schneider, noting the new "[s]tressors [of being] served with charges last week by [the] Internal Affairs Dep[artment]." Schneider reported having such difficulty falling asleep and staying asleep that he got no more than three hours of sleep a night. He had trouble driving because his thought processes were scattered. Because Schneider was having trouble focusing and even driving, Dr. Tanna wrote a note taking him off work until his appointment with a psychiatrist on September 11, 2012.

¶ 14　Schneider had been working in the evidence room, without any problems with his performance, since early April 2012.

¶ 15　On September 11, 2012, on referral from Dr. Tanna, Schneider consulted a psychiatrist, Dr. Syed Waliuddin, complaining chiefly of difficulty sleeping. Dr. Waliuddin diagnosed post-traumatic stress disorder and ordered Schneider to remain off work until September 25, 2012.

¶ 16　On September 25, 2012, Schneider saw Dr. Waliuddin again. According to the history that Dr. Waliuddin took that day, Schneider continued to struggle with anxiety, sleeplessness, and night sweats, and he kept reliving the incident in his head and having a startle reflex each time he did so. Because of the worsening of the symptoms, Dr. Waliuddin ordered Schneider to remain off work until October 16, 2012.

¶ 17　Also on September 25, 2012, Schneider underwent a formal interrogation at city hall. According to Deputy Chief Bill Wolf's testimony in the arbitration hearing, a video of the incident was shown during the formal interrogation, and Schneider displayed no emotion during the showing of the video or at any point during the interrogation.

¶ 18    On November 6, 2012, Dr. Waliuddin wrote another note recommending that, because of the worsening of his symptoms of post-traumatic stress disorder, Schneider should remain off work.

¶ 19    On December 18, 2012, and January 8, 2013, at the request of Elgin, Schneider met with an independent medical expert, Dr. Alexander E. Obolsky, a forensic psychiatrist. On the basis of his interview of Schneider, his review of the medical records, and the results of psychological tests he administered, Dr. Obolsky concluded that Schneider was malingering and that, instead of suffering from post-traumatic stress disorder, he had anxiety and depression resulting from disagreements with his employer. Dr. Obolsky was unconvinced that, for a police officer, the shooting incident would have been traumatic enough to cause post-traumatic stress disorder. Besides, Dr. Obolsky found objective evidence that Schneider had been less than honest with him. In two of the five cognitive tests, Schneider performed worse than someone would perform who had a brain injury, a cognitive impairment, or dementia. And in two other tests, Schneider's performance was so inconsistent as to show poor effort. Schneider had presented himself as having psychological problems that were so abundant and disturbing that his exaggeration was patent.

¶ 20    On February 8, 2013, Dr. Waliuddin wrote a letter opining, "with a reasonable degree of medical and psychiatric certainty," that (1) Schneider "suffer[ed] from Post Traumatic Syndrome, which was caused by involvement in an on[-]duty shooting on March 17, 2012," and (2) he was "not able to return to his job duties as a police officer at this time."

¶ 21    Having reviewed the video of the incident, Elgin concluded that, contrary to his account, Schneider was never brushed by a passing vehicle. Elgin was unconvinced that Schneider was physically endangered at any point during the incident. On July 29, 2013, on the basis of Elgin's own internal affairs investigation of Schneider's conduct, Elgin terminated his employment.

¶ 22    On August 1, 2013, at the request of his attorney, Schneider was examined by a neuropsychologist, Dr. Aaron Malina, who administered the same battery of tests that Dr. Obolsky had administered. Dr. Malina did not know how to explain the test results that Dr. Obolsky had obtained. When Dr. Malina administered to Schneider the same cognitive effort tests that Dr. Obolsky had administered, Dr. Malina obtained normal results. On the basis of a clinical interview, a review of the medical records, and the results of psychological testing, Dr. Malina diagnosed post-traumatic stress disorder related to the shooting incident. He opined that Schneider needed further psychiatric treatment and that he was disabled from returning to work as a police officer at that time. In an evidence deposition, Dr. Malina was asked why, in his opinion, Schneider should not yet resume his occupation as a police officer. Dr. Malina answered:

"He's still actively symptomatic. It would be unsafe.

Q. Who would it be unsafe for?

A. The public potentially. He's a police officer, and he's armed."

¶ 23    On cross-examination, Dr. Malina admitted that the prospect of being unemployed could contribute to depression and anxiety. Dr. Malina explained, however, that unemployment typically would not cause the symptoms of post-traumatic stress disorder of which Schneider—credibly, in Dr. Malina's view—had complained: hypervigilance, an increased startle reaction, and intrusive experiences such as nightmares, flashbacks, and the irresistible recurrence of the traumatic event in the mind.

¶ 24    On March 21 and September 10, 2013, at the request of Elgin's pension board, Schneider was evaluated by a psychiatrist, Dr. Richard Harris. On the basis of his interview of Schneider and his examination of the medical records and psychiatric reports, Dr. Harris concluded that, instead of suffering from post-traumatic stress disorder, Schneider was suffering from non-disabling

anxiety and depression. Dr. Harris admitted, however, that he lacked the training to administer psychological tests and that he rarely used them in the formulation of his psychiatric opinions. He acknowledged that there were psychological tests which could be used to ascertain whether someone was suffering from post-traumatic stress disorder. He did not recall if he had reviewed the results of such tests that were administered to Schneider.

¶ 25    Dr. Stevan Weine was another psychiatrist hired by Elgin's pension board. After examining Schneider on April 9, 2013, and after reviewing the medical records and Dr. Obolsky's report, Dr. Weine concluded that Schneider did not have post-traumatic stress disorder. Instead, in Dr. Weine's opinion, Schneider had an adjustment disorder with mixed anxiety and a depressed mood, a condition that would not significantly impair Schneider as a police officer. Dr. Weine had four reasons for concluding that Schneider did not meet the diagnostic criteria for post-traumatic stress disorder. First, Schneider exaggerated or feigned his symptoms, giving affirmative answers to almost everything even though it was apparent he did not have the symptoms in question. Second, Schneider exaggerated the degree of trauma in the shooting incident. Third, he minimized the contribution of other stressors, such as having a first child, buying a new house, marital discord, and his discontent in the workplace. Fourth, he was distressed and anxious about being transferred and investigated, and he tended to assign that distress and anxiety to the shooting incident—which, in Dr. Weine's view, was an event of only moderately traumatic intensity. Unlike Dr. Obolsky, Dr. Weine was not certain that Schneider was malingering, but he had strong concerns that Schneider was malingering.

¶ 26    On September 30, 2013, in a divorce case, Schneider petitioned for temporary and permanent custody of his son. In support of his petition, he submitted an affidavit in which he attested that he was "a physically and emotionally healthy person."

¶ 27    In February 2014, Schneider withdrew his application for a line-of-duty disability pension.

¶ 28    Schneider testified that although he had never been released to return to work and although he continued to have difficulty sleeping and still had flashbacks a few times each month, the bills had been piling up and, consequently, he began looking for work. (He had to stop seeing Chesney and Dr. Waliuddin because their bills were going unpaid and he could not afford any further treatment.)

¶ 29    From August 2013 to April 2014, Schneider worked as a doorman and bouncer at a restaurant, supervising 12 other doormen, checking identifications, and ensuring the bar was a safe environment.

¶ 30    In May 2014, the school district in Huntley, Illinois, hired Schneider as a security assistant, at an hourly rate lower than that which he would have received as a police officer employed by Elgin. His job at the Huntley school district is to supervise the renovation of the high school, do background checks on construction personnel, and monitor them at the construction site. He continues to work in this position, in which he has no weapon or police powers and in which he is not required to physically confront individuals.

¶ 31    Although Schneider, by his own account, still loses sleep a few times per month and has some bouts of anxiety and although he now and then finds himself reliving the incident, he believes that the frequency and intensity of his symptoms have decreased. He now takes no medications. He has read a book on post-traumatic stress disorder, from which he has learned helpful strategies for managing the condition.

¶ 32    On February 14, 2017, the Commission found that the shooting incident had inflicted post-traumatic stress disorder on Schneider. The Commission ordered Elgin to pay him 86 4/7 weeks

of temporary total disability benefits for the period of September 5, 2012, to May 4, 2014, and also to pay his medical bills through May 5, 2014.

¶ 33    Both parties petitioned for judicial review. On August 24, 2017, the circuit court of McHenry County confirmed the Commission's decision, concluding that the Commission's findings with respect to an accident, medical causation, temporary total disability benefits, and medical expenses were not against the manifest weight of the evidence. The court remanded the case to the Commission, however, to determine whether Schneider was entitled, additionally, to temporary partial disability benefits.

¶ 34    On August 15, 2018, the Commission issued its second decision, which awarded temporary partial disability benefits to Schneider for the period of May 5 to September 20, 2015. Elgin petitioned for judicial review.

¶ 35    On August 2, 2019, the circuit court confirmed the Commission's decision.

¶ 36    This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38                              A. The Law of the Case

¶ 39    In its review of the decision that the Commission issued on remand, the circuit court assumed that the decision the court made previously, when remanding the case to the Commission, was now the law of the case. In its previous decision, the court held that the Commission's decision regarding causation, temporary total disability, and medical expenses was not against the manifest weight of the evidence. After so holding, the court remanded the case to the Commission for the limited purpose of addressing the issue of temporary partial disability benefits. The Commission issued its decision on remand, and Elgin sought judicial review again. In the second action for judicial review, the court believed it was precluded by the law of the case from further reviewing

the issues of causation, temporary total disability, and medical expenses. The court derived that belief from *Relph v. Board of Education of DePue Unit School District No. 103*, 84 Ill. 2d 436 (1981).

¶ 40    *Relph*, however, discussed remands from the appellate court or the supreme court to a lower tribunal, not remands from the circuit court to the Commission. *Id.* at 443. Assume that, in an initial appeal, the appellate court expounds its view of the law, reverses the circuit court's judgment, and remands the case for further proceedings in accordance with that exposition of the law. If, after the circuit court issued its decision on remand, the case were appealed again to the appellate court, the law of the case would bind the appellate court to the legal principles it propounded in the first appeal. *Id.* It is important to note, however, that the appellate court's first decision (the decision remanding the case to the circuit court) would be a final, appealable judgment—an essential element of the law of the case. Only an unreversed final judgment can become the law of the case in subsequent proceedings. See *Ming Auto Body/Ming of Decatur, Inc. v. Industrial Comm'n*, 387 Ill. App. 3d 244, 253 (2008). The circuit court's decision remanding the case to the Commission for the consideration of temporary partial disability benefits was not a final judgment. See *Pace Bus Co. (South Division) v. Industrial Comm'n*, 337 Ill. App. 3d 1066, 1069 (2003). The law-of-the-case doctrine was, therefore, inapplicable in the second action for judicial review. See *Ming*, 387 Ill. App. 3d at 253.

¶ 41        B. Sudden, Severe Emotional Shock Resulting in Psychological Disability

¶ 42    Before *Pathfinder Co. v. Industrial Comm'n*, 62 Ill. 2d 556 (1976), "mental disability was compensable only if it was precipitated by physical contact or injury." *Diaz v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 120294WC, ¶ 23. In other words, if the claim was for psychological injuries, the theory of recovery had to be "physical-mental," meaning that "the

injuries [were] related to and caused by a physical trauma or injury." *Matlock v. Industrial Comm'n*, 321 Ill. App. 3d 167, 171 (2001). After *Pathfinder*, the theory of recovery could be, alternatively, "mental-mental, [if] the [psychological] injuries [were] caused by sudden[,] severe emotional shock traceable to a definite time and place and cause even though no physical trauma or injury was sustained." *Id.*; see also *Diaz*, 2013 IL App (2d) 120294WC, ¶ 23. This is the theory of recovery that Schneider advances in the present case: a "mental-mental" theory.

¶ 43    To recover workers' compensation benefits under a "mental-mental" theory, the claimant must prove that he or she "suffered a 'sudden, severe emotional shock traceable to a definite time, place[,] and cause which causes psychological injury or harm.' " *Chicago Transit Authority v. Illinois Workers' Compensation Comm'n*, 2013 IL App (1st) 120253WC, ¶ 20 (quoting *Pathfinder*, 62 Ill. 2d at 563); see also *Diaz*, 2013 IL App (2d) 120294WC, ¶ 33. Whether the claimant suffered such an emotional shock is a matter of inference and, as such, a factual question. See *Chicago Transit*, 2013 IL App (1st) 120253WC, ¶ 24. On appeal, we defer to the Commission's findings of fact unless they are against the manifest weight of the evidence (see *id.*), that is, unless "no rational trier of fact could have agreed with" the Commission (*McAllister v. Illinois Workers' Compensation Comm'n*, 2020 IL 124848, ¶ 30).

¶ 44    Elgin argues that because Schneider's physical safety was never seriously at risk and because he witnessed no grave bodily injury, it is against the manifest weight of the evidence that he suffered a "sudden, severe emotional shock." *Pathfinder*, 62 Ill. 2d at 563. When attempting to escape, the prisoner never tried to harm Schneider and never threatened to do so. Also, Elgin argues, the video of the incident refuted Schneider's testimony that he was brushed by a passing vehicle. As soon as the prisoner began kicking out the window, Schneider slowed down and pulled over, and, consequently, the prisoner was apparently uninjured by his exit from the car.

¶ 45    Of course, Schneider witnessed the serious injuries that he himself deliberately inflicted upon the prisoner, but Schneider could not have been *shocked*, properly speaking—*i.e.*, he could not have experienced "a feeling of disturbed surprise"—at his or her own volitional act of shooting the prisoner twice. New Oxford American Dictionary 1575 (2001) (definition of "shock"). Intentionally shooting someone may well provoke strong emotions in the shooter, but sudden shock or surprise would not be among them. One is "shocked," in the true sense of the word, only by what happens to oneself or another, not by what one chooses to do.

¶ 46    Arguably, though, other aspects of Schneider's experience on Illinois Route 53 on March 17, 2012, would have been severely shocking to "a person of normal sensibilities." *Pathfinder*, 62 Ill. 2d at 567. While Schneider was driving down the highway, one of the prisoners kicked out a passenger-side window and dived out of the car, onto a travel lane of the highway and into the path of oncoming traffic. That self-endangering act by the prisoner could have provoked in Schneider an intense feeling of disturbed surprise. And Schneider might well have suffered a further shock when the prisoner picked himself up off the highway and tried to enter another vehicle, which had been approaching from behind and had slowed and stopped. This development was, by Schneider's account, especially disturbing to him because if the prisoner had gained entry to one of the stopped vehicles, the prisoner could have harmed people in the vehicle and could have weaponized the vehicle against Schneider, who, because of the prisoner's close proximity to the innocent occupants of the vehicle, would have been ill able to protect himself. Arguably, that Schneider felt compelled to shoot the prisoner tended to confirm that Schneider was in an extreme state emotionally. For all those reasons, it is inferable that Schneider's experiences on March 17, 2012, caused him to suffer "a sudden, severe emotional shock." *Id.* at 563.

¶ 47    Elgin contends, however, that because Schneider's "symptoms were not sufficiently immediate and severe after the accident," it was against the manifest weight of the evidence "that the shooting incident caused a sudden and severe emotional shock required by *Pathfinder*." But Schneider testified that, after shooting the prisoner, he "experienced a rapid heartbeat and could not catch his breath." (We quote from the arbitrator's decision.) He also testified that "he was fatigued" and "that he had never experienced these symptoms before this occurrence." A rapid pulse, breathlessness, and a feeling of being drained of strength are commonly known to be physical manifestations of a sudden and severe emotional shock. Assuming, then, for the sake of argument, that outward symptoms of a sudden and severe emotional shock must be immediately evident to satisfy *Pathfinder* (*cf. General Motors Parts Division v. Industrial Comm'n*, 168 Ill. App. 3d 678, 687 (1988), and *Diaz*, 2013 IL App (2d) 120294WC, ¶ 8), a reasonable trier of fact could believe Schneider's testimony that he immediately experienced such outward symptoms (see *McAllister*, 2020 IL 124848, ¶ 30).

¶ 48    There was, however, a further factual question: whether the sudden, severe emotional shock caused a psychological injury that disabled Schneider from continuing to serve as a police officer. See *Pathfinder*, 62 Ill. 2d at 563. The Commission found him to be temporarily disabled and, accordingly, awarded him two kinds of disability benefits: temporary partial disability benefits and temporary total disability benefits. "When the employee is working light duty on a part-time basis or full-time basis and earns less than he or she would be earning if employed in the full capacity of the job or jobs, then the employee shall be entitled to temporary partial disability benefits." 820 ILCS 305/8(a) (West 2012). "[T]emporary total disability occurs when an employee is unable to perform any work except that for which no labor market of reasonable stability exists." *Dolce v. Industrial Comm'n*, 286 Ill. App. 3d 117, 122 (1996). To recover those types of benefits,

"a claimant must show by a preponderance of the evidence that he or she has suffered a *disabling* injury arising out of and in the course of his or her employment." (Emphasis added.) *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 591-92 (2005).

¶ 49 Elgin disputes that Schneider sustained a psychological disability "arising out of" his employment. *Id.* Elgin's reason for disputing the arising-out-of element is this. Seventeen days after the shooting incident, Schneider returned to full-time duty as a police officer. He was assigned to the evidence room. During the five months he worked in the evidence room, he manifested no disabling psychological symptoms or deficits in performance. Then, when Elgin served upon him a notice that discipline was being contemplated against him, his purportedly disabling psychological symptoms suddenly flared up. Being investigated, formally interrogated, and ultimately fired for misconduct might well cause a growing sense of anxiety and insecurity but not "a sudden, severe emotional shock." *Pathfinder*, 62 Ill. 2d at 563. Again, under a "mental-mental" theory, the "psychological injury or harm" must be "cause[d]" by "a sudden, severe emotional shock traceable to a definite time, place[,] and cause." *Id.*; *Diaz*, 2013 IL App (2d) 120294WC, ¶ 33 (referring to "the sudden, severe emotional shock *which must be proved*" (emphasis added and internal quotation marks omitted)); *Chicago Transit*, 2013 IL App (1st) 120253WC, ¶ 20 (interpreting *Pathfinder* as "requir[ing] a claimant alleging a mental-mental claim to prove that she suffered a sudden, severe emotional shock" (internal quotation marks omitted)). Dread of an administrative investigation is not the sudden, jarring emotional disturbance that *Pathfinder* describes. It might be a gnawing anxiety, but it would not be a sudden, severe shock.

¶ 50 Citing *Esco Corp. v. Industrial Comm'n*, 169 Ill. App. 3d 376, 384 (1988), and *Skidis v. Industrial Comm'n*, 309 Ill. App. 3d 720, 723 (1999), Elgin argues that a claimant's anxiety over the loss of employment is not compensable. Indeed, the appellate court repeatedly has interpreted

*Esco* as "reject[ing] claims for mental disabilities resulting from *** disciplinary actions taken by employers." *Chicago Transit*, 2013 IL App (1st) 120253WC, ¶ 19 n.1; see also *Northwest Suburban Special Education Organization v. Industrial Comm'n*, 312 Ill. App. 3d 783, 788 (2000). It follows that, insomuch as Schneider suffered a disabling psychological injury resulting from the internal affairs investigation, the formal interrogation, and the involuntary termination of his employment, his injury is non-compensable. See *Chicago Transit*, 2013 IL App (1st) 120253WC, ¶ 19 n.1; *Northwest Suburban*, 312 Ill. App. 3d at 788. These "disciplinary actions" were "nothing more than the usual employment tensions." *Northwest Suburban*, 312 Ill. App. 3d at 788. "[A]nxiety, emotional stress[,] or depression which develop[s] over time in the normal course of an employment relationship does not constitute a compensable injury within the holding of *Pathfinder*." *General Motors*, 168 Ill. App. 3d at 687.

¶ 51    Before Elgin issued to Schneider the anxiety-inducing charges, he might have appeared on the surface to be functioning well enough. In both April and June 2012, Dr. Tanna had opined that Schneider was able to return to work as a police officer, without restrictions. On April 3, 2012, Elgin assigned Schneider to work in the evidence room, not because he was suffering from any known psychological malady but because it was routine to remove a police officer from the field while the officer's shooting of someone in the line of duty was being investigated. From April 3 to September 4, 2012, a period of five months, Schneider worked in the evidence room without any problems with his performance. On August 30, 2012, while Schneider apparently was doing fine in the evidence room, Elgin issued to him administrative charges and a notice that he would be formally interrogated. On September 5, 2012, less than a week after he received the charges, Schneider went to Dr. Tanna, complaining that he was worried and irritable about everything, especially the charges, and that he was having difficulty focusing and even driving. Dr. Tanna then

took Schneider off work and referred him to a psychiatrist. Since September 5, 2012, Schneider has never returned to work as a police officer. Since then, however, he has worked in other, lower-paying occupations, and, in a child-custody case, he has sworn to his emotional health.

¶ 52    Despite all those facts, the Commission could reasonably believe Dr. Malina's opinion that the "accident" of March 17, 2012, left Schneider psychologically disabled from being a police officer. We have five reasons for regarding the Commission's resolution of this factual issue as not being against the manifest weight of the evidence.

¶ 53    First, Dr. Tanna was a family physician, whereas—perhaps more relevantly to the issues in this case—Dr. Waliuddin was a psychiatrist and Dr. Malina was a neuropsychologist. Although Dr. Tanna opined on June 18, 2012, that Schneider was medically stable and could return to his regular work duties, Dr. Waliuddin and Dr. Malina had professional expertise that, arguably, was more specific to the question of whether Schneider's post-traumatic stress disorder was disabling. The Commission could have reasonably given greater weight to the opinions of Dr. Waliuddin and Dr. Malina. After all, it was Dr. Tanna who had referred Schneider to Dr. Waliuddin.

¶ 54    Second, Schneider's successful five-month stint in the evidence room, in which his only duties were to assist the evidence custodian and do paperwork, had little tendency to refute Dr. Malina's opinion that post-traumatic stress disorder incapacitated Schneider from being a police officer. It might be true that, notwithstanding the post-traumatic stress disorder, Schneider was capable of doing many of the mundane, day-by-day tasks a police officer would perform. Dr. Malina's concern, however, was quite narrow: he was concerned that, until Schneider was asymptomatic, it would be detrimental to public safety to allow him to serve as a police officer *armed with a gun*. In other words, in Dr. Malina's opinion as we understand it, what made the post-traumatic stress disorder disabling for Schneider as a police officer was the potential

distortion of judgment in circumstances of greatly heightened stress, specifically, the judgment of whether to use deadly force. In the evidence room, Schneider did not have to deal with rowdies and ruffians while armed with a gun. In sum, then, we acknowledge that, after the shooting incident, Schneider showed himself capable of doing a variety of things. As Elgin observes, he could file paperwork, go to the shooting range, undergo a formal interrogation without losing his composure, eject intoxicated patrons from a bar, and oversee the security of a school construction site. But none of those observations speak to Dr. Malina's concern.

¶ 55    Third, Schneider began undergoing psychological counseling on April 19, 2012, the month after the shooting incident. In that respect, his case is distinguishable from *General Motors*, 168 Ill. App. 3d at 688, in which the claimant sought no treatment for his psychological condition until 15 months after the allegedly traumatizing event. Also, Schneider began complaining to Dr. Tanna of symptoms early on, beginning on April 2, 2012. It is not that, after he was served with the administrative charges in September 2012, Schneider suddenly began alleging symptoms.

¶ 56    Fourth, although Dr. Tanna admitted that unemployment could contribute to Schneider's sadness and anxiety, unemployment typically would not cause the hypervigilance, intrusive memories, nightmares, and flashbacks that were characteristic of post-traumatic stress disorder.

¶ 57    Fifth, even though in September 2013, in a child-custody case, Schneider filed an affidavit averring that he was emotionally healthy, the Commission could have disbelieved the affidavit. Self-assessments of psychological health are not infallible. That is why people undergo psychological evaluations.

¶ 58    To be sure, the psychological evaluations in this case are in sharp conflict. Dr. Obolsky and Dr. Weine found Schneider to be exaggerating or feigning mental-health symptoms, but Dr. Malina found no evidence of malingering. These differing findings are explainable. Because it was

Schneider's attorney who had sent him to Dr. Malina whereas it was Elgin who had sent him to Dr. Obolsky and Dr. Weine, Schneider might have felt more inclined to be honest with Dr. Malina, whom he perceived as friendly, than with Dr. Obolsky and Dr. Weine, whom he perceived as being hostile. Likewise, Schneider might have been more open and honest with Dr. Waliuddin, to whom Dr. Tanna had referred him. Even if Schneider was dishonest with Dr. Obolsky and Dr. Weine, it did not necessarily follow that he was dishonest with Dr. Waliuddin and Dr. Malina. It could be that, when Schneider gave an honest account of his symptomology, post-traumatic stress disorder was indeed indicated. The Commission took into account that Dr. Obolsky, Dr. Weine, and Dr. Harris differed in their assessments from Dr. Waliuddin and Dr. Malina, and the Commission chose to believe Dr. Waliuddin and Dr. Malina. We cannot say it would be impossible for a reasonable trier of fact to believe Dr. Waliuddin and Dr. Malina over Dr. Obsolsky, Dr. Weine, and Dr. Harris. Therefore, we defer to the Commission's assessment of credibility. See *McAllister*, 2020 IL 124848, ¶ 30.

¶ 59    In sum, by finding that, on March 17, 2012, Schneider "suffer[ed] a sudden, severe emotional shock traceable to a definite time, place[,] and cause which cause[d] psychological injury or harm" to him (*Pathfinder*, 62 Ill. 2d at 563), the Commission did not make a finding that was against the manifest weight of the evidence (see *Chicago Transit*, 2013 IL App (1st) 120253WC, ¶ 24).

¶ 60                                    C. Medical Expenses

¶ 61    Under section 8(a) of the Workers' Compensation Act (820 ILCS 305/8(a) (West 2012)), Schneider "is entitled to recover reasonable medical expenses that are causally related to the accident and that are determined to be required to diagnose, relieve, or cure the effects of" his post-traumatic stress disorder. *F & B Manufacturing Co. v. Industrial Comm'n of Illinois*, 325 Ill. App.

3d 527, 534 (2001). He "is entitled to recover only those medical expenses which are reasonable and causally related to an industrial accident." *Zarley v. Industrial Comm'n*, 84 Ill. 2d 380, 389 (1981). "The question of whether medical treatment is causally related to a compensable injury is one of fact to be determined by the Commission, and its finding on the issue will not be reversed on review unless [the finding is] contrary to the manifest weight of the evidence." *Elmhurst Memorial Hospital v. Industrial Comm'n*, 323 Ill. App. 3d 758, 764-65 (2001).

¶ 62　Because, in Elgin's view, Schneider's psychological symptoms resulted from the internal affairs investigation and the disciplinary proceedings and not from the shooting incident, and because Dr. Tanna found Schneider to be medically stable and fit to resume his normal job duties as of June 18, 2012, Elgin disputes its obligation to pay for medical treatment beyond that date. Elgin represents that it paid Schneider's medical bills through June 18, 2012, and even some medical bills that he incurred afterward. The Commission decided, however, that Elgin's liability for medical expenses should not end there. The Commission found Elgin to be liable for prospective medical care. That finding, Elgin contends, is against the manifest weight of the evidence because medical care beyond June 18, 2012, is causally unrelated to the shooting incident.

¶ 63　If, however, Schneider continued to suffer from post-traumatic stress disorder and if the work-related "accident" of March 17, 2012, had caused this psychological injury, Schneider would be entitled to compensation for prospective medical treatment that was "reasonably required to cure or relieve from the effects of" the psychological injury (820 ILCS 305/8(a) (West 2012)). See *Plantation Manufacturing Co. v. Industrial Comm'n*, 294 Ill. App. 3d 705, 710 (1997). The Commission found those statutory conditions to be proven, and as we have discussed, the Commission's finding is not against the manifest weight of the evidence. See *Dye v. Illinois*

*Workers' Compensation Comm'n*, 2012 IL App (3d) 110907WC, ¶ 10. Therefore, the premise behind Elgin's challenge to its continued obligation to pay for medical treatment is unsound.

¶ 64                    D. Temporary Total Disability and Temporary Partial Disability

¶ 65    Elgin asserts that it "offered [Schneider] light duty," *i.e.*, assignment to the evidence room, and that "he stopped working light duty on September 5, 2012[,] even though he had no problems working light duty." On the authority of *Sharwarko v. Illinois Workers' Compensation Comm'n*, 2015 IL App (1st) 131733WC, ¶ 49, Elgin argues that if the employer is willing to accommodate an injured employee's medical restrictions, the employee's refusal to work within those restrictions authorizes the termination of temporary total disability benefits and temporary partial disability benefits.

¶ 66    But continuing to work in the evidence room on September 5, 2012, was not within Schneider's medical restrictions, for, on that date (to quote from Elgin's brief), Dr. Tanna "issued a note indicating [that Schneider] was unable to work for medical reasons." And soon afterward, Dr. Waliuddin, the psychiatrist to whom Dr. Tanna had referred Schneider, likewise "ordered [Schneider] to remain off work" (to quote again from Elgin's brief.)

¶ 67    Assuming that Schneider is entitled to temporary partial disability benefits, Elgin points out that the Commission miscalculated the amount of such benefits for the period of September 8 to 21, 2014. On the third page of the decision that the Commission issued on remand on August 15, 2018 (case No. 18-IWCC-0500), the Commission listed Schneider's gross pay as $1151.20. According to an earnings statement, however, from Consolidated School District 158, Schneider's gross pay for that period actually was $1485.77. Thus, the correct difference between the potential wage of $3437.24 and the actual gross pay of $1485.77 is $1951.47. Section 8(a) of the Workers' Compensation Act provides that an employee working light duty is entitled to temporary partial

disability benefits equal to two-thirds of the difference between the "average amount that the employee would be able to earn" in the full performance of the employee's duties and the net amount the employee is earning in the modified job. 820 ILCS 305/8(a) (West 2012). Two-thirds of the difference of $1951.47 is $1300.98, which is the correct amount of temporary partial disability benefits owed for September 8 to 21, 2014, instead of the $1524.03 the Commission awarded for that period. Thus, Elgin explains, the Commission awarded $223.05 more of temporary partial disability benefits for the period of September 8 to 21, 2014, than it should have awarded ($1524.03 minus $1300.98). Elgin requests us to reduce the award of such benefits accordingly from $45,436.68 to $45,213.63 ($45,436.68 minus $223.05 equals $45,213.63). In his brief, Schneider does not appear to dispute this requested adjustment.

¶ 68                                    III. CONCLUSION

¶ 69    We affirm the circuit court's judgment, which confirmed the Commission's decision on remand, except that we reduce the award of temporary partial disability benefits to $45,213.63.

¶ 70    Affirmed as modified.